IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CORNELIUS BENNETT | ) | |
| EARLIE FUSE | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | JURY TRIAL DEMANDED |
| CITY OF CENTREVILLE, a municipal | ) | |
| Corporation, jointly and severally, | ) | |
| TOWNSHIP OF CENTREVILLE, a | ) | |
| municipal corporation, jointly and | ) | |
| severally, COMMONFIELDS OF | ) | |
| CAHOKIA, CURTIS MCCALL, in his | ) | |
| individual and official capacity, MARIUS | ) | |
| "MARK" JACKSON, in his individual and | ) | |
| official capacity, LAMAR GENTRY, in his | ) | |
| individual and official capacity, and | ) | |
| DENNIS TRAITEUR, in his individual | ) | |
| and official capacity, | | |
| DEFENDANTS. | | |

1

**COMPLAINT**

Comes now Plaintiffs, by and through their counsel, Nicole D. Nelson of Equity Legal Services, Inc. and Kalila Jackson of the Metropolitan St. LouisEqual Housing and Opportunity Council ("EHOC"), and for their Complaint for Injunctive Relief state as follows:

**INTRODUCTION**

With a population of approximately 5,000 people, Centreville, Illinois sits in Metro East Illinois, so close to East St. Louis that the two municipalities share a zip code, children in Centreville often attend East St. Louis High School, and depending on what side of the street you are on, step one foot over and you can easily transition from being in Centreville to East St. Louis. In recent years, Centreville has been in the news because of its infamous ranking as one of the poorest cities in the nation. Couple that with its demographics, which reflect a population that is 95% African-American, and a community where one-third lives below the poverty line, and it becomes clear that somewhere in the City of Centreville and even beyond, decisions have been made to disinvest in this community of people. A City does not become the poorest in the nation overnight. Raw sewage does not simply begin flowing into yards and into homes over the course of one day. Manholes do not immediately become over capacity nor pump stations intended to push wastewater to treatment plants suddenly stand dilapidated in ditches and on the side of roads in barely operable condition.   These conditions occur due to a string of collective decisions not to invest in a community.

Despite the sheer indifference and unwillingness from the parties that are responsible for providing the Plaintiffs and their neighbors these very basic commodities such as an operable

and safe sanitary sewer and stormwater systems, the Plaintiffs are adamant in their desire to remain in their homes. There has been nothing quite as prominent and tangible as the emblem of generational wealth than home ownership. For African-Americans, attaining this tangible goal, despite the numerous barriers they encountered along the way (e.g. segregation, red-lining), was and is a triumph.[1]

   This historical context is relevant for this case, these Plaintiffs, their community and the relief they seek.  Both Plaintiffs, Cornelius Bennett and Earlie Fuse, are African-American men. Both men own their homes. Plaintiffs are no exception in their community. Almost every single one of their neighbors and those in the surrounding areas of Centreville are African-American, own their homes and have owned their homes for decades. During their early years of home ownership, both Mr. Bennett and Mr. Fuse invested thousands of dollars in their homes for improvements. To move would mean to start over, to take on a mortgage that neither has had in years nor can either afford. The request and reason for relief is as straightforward as this court will find both men. They want the problems fixed. They want the flooding and raw sewage to stop coming into their homes and yards and to stop damaging their properties. The Plaintiffs want to enjoy their properties once again without the stench of raw sewage and stagnant stormwater. While damages may be appropriate in other circumstances, Plaintiffs petition this court for intervention and request a substantive resolution because damages are insufficient in these circumstances. Absent intervention that requires proper replacement of the stormwater and sanitary sewer infrastructure, Plaintiffs remain subjected to unending raw sewage overflows and

---

[1]Coates. Ta-Nehisi. The Case for Reparations. June 2014. The Case for Reparations by Ta-Nehisi Coates

stormwater flooding, left with no properties to enjoy and what, if any, remains of their homes to pass down.

## **NATURE OF ACTION**

1.   This is a civil action for injunctive relief and civil penalties brought under 42 U.S.C. § 1983 against (1) Defendant City of Centreville, (2) Township of Centreville, and (3) Commonfields of Cahokia pursuant to the Fifth Amendment Takings Clause, which provides that "no private property shall be taken for public use, without just compensation." U.S. Constitution Amend V.

## **JURISDICTION AND VENUE**

2.   This court has subject matter jurisdiction over claims in this action under 42 U.S.C. § 1983 pursuant to the Fifth Amendment. This Court also has jurisdiction under 28 U.S.C. § 1331 (federal question).

3.    This Court has personal jurisdiction over the Defendants, City of Centreville, Township of Centreville and Commonfields of Cahokia, and the venue is proper in the Southern District of Illinois, under 28 U.S.C. § 1391(b)(2), because this is the district where these respective Defendants are located and where the alleged violations occurred.

## **PARTIES**

4.   The  City of Centreville (herein, "City") is a municipal corporation located in St. Clair County, Illinois.

5.   The City of Centreville provides stormwater and sanitary sewer services for the Plaintiffs.

6.   Township of Centreville (herein, "Township") is a municipal corporation located in St. Clair County, Illinois.

7.The Township of Centreville provides stormwater and sanitary sewer services for the Plaintiffs either directly or indirectly through oversight through its agents.

8. Commonfields of Cahokia Public Water District (herein "Commonfields") is a public water district created and existing under the laws of the State of Illinois and located in St. Clair County, Illinois. *See*, Public Water District Act (70 ILCS 3705/1 *et. seq.*).

9. Commonfields is a sanitary district providing water and wastewater distribution for the Plaintiffs.

10. Curtis McCall Sr. is the Township Supervisor for Defendant Centreville Township.

11. Dennis Traiteur is the Superintendent and Public Water District Operator for Commonfields of Cahokia.

12. Marius "Mark" Jackson is the Mayor of the City of Centreville.

13. Defendant La Mar Gentry is the Tax Increment Financing (TIF) Administrator for the City of Centreville and he is the Village Administrator for the Village of Alorton. In both roles, Defendant Gentry has significant working knowledge of the lift stations owned, operated and maintained by Defendants and oversees projects, including finances, related to lift stations and infrastructure needs throughout jurisdictions maintained by all Defendants. Defendant Gentry

has been equally aware of the flooding and sewage overflow risks and damages associated with Defendants' broken lift stations and barely functioning infrastructure.

14.     The Plaintiffs are, and at all relevant times herein, were residents and owners of real and personal property located in the City of Centreville and/or Township of Centreville, County of St. Clair and State of Illinois.

15.   Plaintiff, Cornelius Bennett, is a resident of the City/Township of Centreville, County of St. Clair and State of Illinois, and at all relevant times herein, has been the owner of real and personal property located at 80 N. 80th Street in said City, county and state.

16.   Plaintiff Earlie Fuse is a resident of the City/Township of Centreville, County of St. Clair and State of Illinois, and at all relevant times herein, has been the owner of real and personal property located at 5951 Piat Place in said City, county and state.

**LEGAL STANDARD FOR FIFTH AMENDMENT TAKINGS CLAIM**

17.     There are multiple factors this Court must consider as it determines the merits of Plaintiffs' Fifth Amendment Takings claims which include: **how long** Plaintiffs have suffered from the flooding events, the **foreseeability** of the flooding events and risks, and the **type of land** Plaintiffs own such that their expectations are reasonable as it relates to use of the land and their investments.See, *Arkansas Game & Fish Commission v. United States*, 568 U.S. 23, 32 (2012).  In addition to the Fifth Amendment Takings Clause discussed *infra*, Plaintiffs also bring this case pursuant to  Article I, Section 15 of the Illinois Constitution. The Illinois Constitution provides: "Private property **shall not be taken or damaged** for public use without just

compensation." Illinois Const., Art. I, §15. The Illinois takings clause differs from that of the federal takings clause and offers greater protection by allowing "damaged" property to be included as a possible taking. For purposes of determining a taking in the context of flooding, Illinois courts inquire if the water has "physically invaded" the land such that it has destroyed or "impair[ed] its usefulness." *Hampton v. Metro Water Reclamation Dist.*, 57 N.E. 1229, 1239 (2016).

## BACKGROUND

18.     A community of residents living throughout Centreville have experienced sewage overflows and stormwater flooding for many decades. The two plaintiffs before this court are a microcosm of a much larger, broken system.

19. Although, independently both conditions could exacerbate the plaintiffs' current circumstances, the system that the plaintiffs and their neighbors live with is one that is plagued by municipal indifference and a severely underfunded infrastructure, which has led to a stormwater and sanitary sewer system that is barely operable.

20. This is not a broken system created by the American Bottoms, the name given to the geographic region where plaintiffs live, nor created by climate change.

21.     A walk through Centreville, particularly where Plaintiffs Fuse and Bennett reside in areas known as, "Parkside" and "Ping Pong", quickly reveals the indifference and deliberate disinvestment.

22.  Notably, Mayor Jackson nor Township Supervisor Curtis McCall Sr. reside in neither of these areas.

23.  Upon visiting the areas of Centreville known as "Ping Pong" and "Parkside", visitors are immediately met with ditches overrun with stagnant water, sewage and unmowed grass, manholes paved over by the City in a failed effort to curb overflowing water systems, old piping left by the City of Centreville tossed to the side of the road across the street from homes, dilapidated pump stations left open for anyone driving by to observe, and half-done jobs of trenching by the City seemingly created to assist with the stormwater flow, but the job never fully completed. **(See attached Group Exhibit A)**. Defendants' significant infrastructure issues and the broken conditions of many of their lift stations are well-known to Defendant Gentry and Defendant Traituer (**See attached Exhibit B).**

24. The City and Township's respective indifference was referenced in the February 20, 2020, article that appeared in the Belleville News-Democrat. The City's work was described as follows: "[T]he City has been 'trenching to expand existing ditches and in some cases, replace corrugated pipes with PVC, which typically runs underneath driveways. The old corrugated pipes, many of them dented and flattened, were discarded to the side of the roads where many remain… Ditches that are supposed to drain stormwater away from his yard are blocked with leaves and mud."[2].

---

[2]  Mansouri, K. (2020, February 20). Raw sewage invades the homes of Illinois' poorest residents. Why hasn't it been fixed? *Belleville News-Democrat*. Retrieved from https://www.bnd.com/news/local/article240218887.html

25. The parties acknowledge that the City and Township lie in a formerly active portion of the Mississippi River floodplain called the "American Bottoms."

26. However, Plaintiffs as well as other residents of the City and Township of Centreville can provide numerous accounts about the sewage and flooding indicating: (1) flooding and sewage overflows did not occur on the property of the Plaintiffs (nor other residents) when they moved into their homes and; (2) Plaintiffs can pinpoint timelines in which the flooding and sewage began and how it worsened over time with little to no intervention from the City and Township.

27. Plaintiff Bennett and Plaintiff Fuse have suffered from the described issues of stormwater and sewage overflows for 15 and 26 years, respectively.

28. Plaintiff Cornelius Bennett is 69 years old and is retired from Alton Southern Railroad. He has owned and resided at his home located at 80 N. 80th Street in Centreville for 36 years. Mr. Bennett, and his deceased wife, purchased their home and invested money into the property by rehabbing the property over the years. In addition to living in this home with his current wife, Mr. Bennett and his wife also care for their 2 grandchildren, ages 9 and 12.

29. Mr. Bennett has suffered with raw sewage and flooding issues at his home for over 15 years. Mr. Bennett hauls wheelbarrows of lime to the corner of his home where raw sewage is known to seep from the ground and pours the lime down throughout this area with the hope that the smell of raw sewage will not overtake his lawn and home, particularly in the hot, humid summer days. His property is flanked by two ditches; both of these ditches fill with stagnant water from failed stormwater systems throughout the seasons and, even worse, with sewage when the sewer system is full and backed up. In his yard is a children's playset, but Mr. Bennett long ago advised

his grandchildren not to play on it for fear of his grandchildren becoming ill from the nearby sewage.

30.     For Plaintiff Bennett, during or after a flooding event, he may be unable to flush his toilets, access a large portion of his property due to heavy flooding and without or without rainfall, is often unable to allow his grandchildren or visitors to access portions of his property due to sewage overflow and stagnant stormwater from Defendants' systems.  The length of time for which Plaintiff Bennett may be unable to access portions of his property (and not allow others to do so) can vary from an hour to a few days until stormwater and sewage levels reduce per each event.

31.  Plaintiff Earlie Fuse is 79 years old. He owns his home located at 5951 Piat Place. Mr. Fuse and his wife purchased this home in 1992. Mr. Fuse and his wife raised four children and have four grandchildren.

32.When it rains for more than 10-15 minutes around Mr. Fuse's home and in his neighborhood, the streets framing his home both begin to fill with water, making it impossible to leave the home and to navigate a vehicle out of the driveway (or for his neighbors to leave theirs).

33. During and/or after a flooding event, Plaintiff Fuse is unable to leave his driveway, yard or access the street for a lengthy period of time; this can be anywhere from several hours to overnight until the stormwater levels reduce.

34. Over the 28 years Mr. Fuse has owned and lived in this home, his basement wall has collapsed four (4) times due to the amount and force of the water from rain events, the most recent of which occurred on January 11, 2020.

35. The floor of his basement is unrecognizable, caked with mud and filled with water from the constant inundation of stormwater from failed stormwater and wastewater infrastructure.

36. Mr. Fuse's basement was previously decorated as a living space with furniture. It has not been utilized as a living space for years and is no longer habitable as a sleeping space due to the amount of moisture and mud contained in the basement all of which was created by Defendants' broken sanitary and stormwater systems.

37. Plaintiff Cornelius Bennett alleges that storm water and/or raw sewage has backed up into his yard, street, and/or home over the last fifteen (15) years.

38. Plaintiff Earlie Fuse alleges that stormwater and/or raw sewage has backed up into his yard, street, driveway and/or home during the last twenty-eight (28) years.

39. Plaintiffs allege that these raw sewage/stormwater back-ups have created water levels so high that they have been unable to leave their homes for hours at a time, and sometimes for days.

40. These back-ups have left Plaintiffs trapped in their respective homes, unable to leave via vehicle. There have been times agencies have offered to rescue Plaintiff Fuse and his neighbors by boat due to the height of the water.

41. Plaintiffs allege that no ongoing precipitation is required for raw sewage and/or stormwater to back up or stand in their yards and homes.

42. Plaintiffs further allege that there was heavy rainfall on January 11, 2020 in the City/Township of Centreville.

43. Plaintiffs allege that stormwater and/or raw sewage backed up into and around their homes and yards.

44. Specifically, Plaintiff Fuse suffered damage from this rain event and the Defendants' failure to adequately maintain and operate their respective stormwater and wastewater systems when his yard and home were inundated with stormwater and wastewater on January 11, 2020 such that his basement wall collapsed and water rushed into the basement of his home. (**See attached Exhibit C and D**).

45. As noted in paragraph 34, this is not the first time in which Plaintiff Fuse has suffered damage as result of Defendants failure to adequately maintain and operate their respective stormwater and wastewater systems. Plaintiff Fuse has previously had three walls collapse due to stormwater and wastewater damage.

46. Plaintiff Bennett suffers similarly as his property continues to be flanked by two ditches that hold overflowing stormwater mixed with sewage and a yard with sewage seeping from the ground.

47. These back-ups, standing and stagnant water, and raw sewage issues that have taken over Plaintiffs' homes and yards for years are due to recurrent flooding from a negligently maintained

wastewater and stormwater system per Defendants Commonfields and City/Township of Centreville.

48. Plaintiffs Bennett and Fuse bring this action before this court for emergency relief based on recurrent flooding events that damage and trap them in their homes during unpredictable rain events, including severe flooding events that are expected in this region this spring and summer.[3]

49.     Additionally,  current conditions generated by the Defendants have made it impossible for Plaintiffs to enjoy and utilize their properties as intended due to Defendants' stormwater and sewage that is regularly diverted onto Plaintiffs' respective properties and thus interferes with their use and enjoyment.

50.     This, coupled with the impending rainy season, which brings with it an even more urgent public health crisis (COVID-19), creates a potential for exposure to this virus through these sewage and stormwater overflows.

## **City of Centreville**

51. The City of Centreville has a population of approximately 5,000 residents. The City comprises approximately 95% African-Americans and one-third of the population lives below the poverty line.

---

[3] Hirji, Zahra. The Midwest is Preparing to get Hit With Major Floods During the Coronavirus Outbreak. March 20, 2020. Available at:
https://www.buzzfeednews.com/article/zahrahirji/coronavirus-floods-midwest?fbclid=IwAR2yC8Re042V3ja9RU7OlzFGcS9o6h-iljjxs71GnM1BQbDLcp-rt7jj2v0

52. In 2017 and again in 2019, Centreville was listed as the poorest City in the state of Illinois and one of the poorest in the country.[4]

53. The City owns and maintains a portion of its own sanitary sewer system as well as owns and maintains a portion of its own stormwater systems.

54. Defendant Marius Jackson is the current mayor of the City of Centreville. He has been the mayor for twelve years.

55. During his tenure, the City of Centreville has not submitted required financial documentation to the Illinois Comptroller's Office for the last three (3) fiscal years.[5]

56. Since 2007, Defendant Marius Jackson has been tasked with the fiscal responsibility and oversight of the overall operations of the City of Centreville.

57.  In a February 23, 2020, article in the St. Louis Post-Dispatch, the City acknowledged the issue of neglect per incumbent Defendant Jackson. Jackson alleged the neglect started long before his 12-year tenure and that the City lacks funding to make the major fixes.[6]

---

[4] Stebbins, Samuel. "These are the poorest cities in every state in the US. USA Today. May 7, 2019 https://www.usatoday.com/story/money/2019/05/07/poorest-cities-in-every-state-in-the-us/39431283/
[5] Illinois State Comptroller. Available at:

https://illinoiscomptroller.gov/financial-data/local-government-division/local-government-data/landingpage/?code=088/035/30&searchtype=AFRSearch&originalSearchString=Centreville%20-%20a%20City%20in%20St.%20Clair%20County%20-%20088/035/30

[6] Munz, M. (2020, February 23). A plea for help: Centreville's sewage & drainage problems, pose health, safety risks. *St. Louis Post-Dispatch*. Retrieved from https://www.stltoday.com/news/local/illinois/a-plea-for-help-centreville-s-sewage-and-drainage-problems/article_3d6d22c7-8c57-5d1a-8af3-a6e6ee6ea2ee.html

58. Defendant Jackson further acknowledged: "the stuff we are doing is a Band-Aid to what really needs to take place."

59. Mayor Jackson further stated in this article that he is unsure why the City [of Centreville] maintains 10 pumps and Commonfields the rest. He is also unsure why the canals were never maintained, but claims likely due to lack of money and equipment. He explained: "[N]o one ever touched it and now my administration is dealing with that."

60. Defendants City of Centreville and Township of Centreville have taken no actions to permanently resolve and prevent these recurrent conditions.

### **Township of Centreville**

61. Centreville Township has a population of 25, 386. The township was created in 1910 and comprises unincorporated Centreville, Village of Alorton and parts of Cahokia.

62. Supervisor of Centreville Township is Curtis McCall Sr. The Township last reported Defendant McCall's salary as supervisor in 2011 to be $84, 358.56.[7]

63. Defendant McCall sits as a board of trustee for the following entities: Commonfields of Cahokia, Metro East Sanitary District (Vice President), and Eastside Health District.

64. As the township supervisor and chairman of the board of trustees of Commonfield of Cahokia, and board member of the Metro East Sanitary District, Defendant Curtis McCall Sr.

---

[7] (Bischel, 2017)

had sufficient notice of the inadequate and many times, inoperable, sewer and stormwater system issues that plague the Township of Centreville. (**See attached  Exhibit E**).

65. Defendant McCall is the chief executive officer for the Township as well as the treasurer for the road district within the Township. Pursuant to these duties the supervisor is required to "keep a just and true account of the receipts and expenditures." Failure to perform duties results in disqualification as the supervisor. *See*. 60 ILCS 1/70 *et. seq*.

66. It is common knowledge where Plaintiffs reside that several roads within the City and Township of Centreville are in very poor condition, many due to the flooding and sewage overflows that have damaged the roads over time.

67. 63rd Street is a road located within the Defendant Township. Shortly after stormwater flooded the streets on 63rd Street and near Piat Place on January 11, 2020, a hole began to develop in this street. As demonstrated by the attached exhibits, this hole has continued to widen over the last few months with no resolution from Defendants. The photos were taken March 19, 2020 and May 22, 2020, respectively. The photo taken on May 22, 2020, reflects the status of this portion of 63rd street at the time of this filing. **(See attached Group Exhibit F).**

69. In addition to his position as Township Supervisor, Defendant McCall Sr. also receives notice of sanitary sewer infrastructure status and/or issues in the Township through his position as Chairman of the Board of Trustees for Commonfields of Cahokia. (**See attached Group Exhibit G**).

70. Environmental conditions in the City/Township areas where plaintiffs live have been described as follows: "Myla Blandford, assistant administrator and director of environmental health for East Side Health District, said the agency gets calls from people in Centreville community 'consistently' concerning the smell of sewage and the illnesses they relate to it… Typically, the agency responds to the area where there is raw sewage on lawns or for standing water that needs larvicide to prevent mosquito growth."[8]

71. Defendant Township and Defendant McCall Sr., as an agent of the Township, have received notice of the ongoing sewage, stormwater flooding and increased risks of flooding to those who live in the areas of "Ping Pong" and "Parkside" due to complaints received from Plaintiffs, other Centreville residents, and from ongoing lift station repairs that have not resolved these issues.

72. The Village of Alorton lies within the boundaries of the Township of Centreville.[9]

73. The estimated population of Alorton in 2018 was 1,928 and is 97% African-American.

74. JoAnn Reed is the Mayor of Alorton.

75. La Mar Gentry is the Village Administrator for the Village of Alorton.

76. Defendant Gentry maintains oversight projects related to the City of Centreville as it relates to administration of funds including sanitary sewers, pump stations and stormwater systems.

---

[8] Mansouri, K. (2020, February 20). Raw sewage invades the homes of Illinois' poorest residents. Why hasn't it been fixed? *Belleville News-Democrat.* Retrieved from https://www.bnd.com/news/local/article240218887.html

[9] On March 17, 2020, voters in the City of Centreville and Village of Alorton voted to merge the cities into a new municipality named Alcentra. Mansouri, K. (March 17, 2020) Illinois election results show Alorton, Centreville will merge. *Belleville News Democrat.* Retrieved from: https://www.bnd.com/news/politics-government/election/article241281461.html

77. His salary for the Village of Alorton is currently unknown. His salary for the City of Centreville is currently unknown.

78. Defendants City of Centreville and Township of Centreville have been aware that the pump stations, sewer systems and stormwater systems that they service, maintain and/or own are either full and unable to take on incoming wastewater or are inoperable, causing recurrent flooding and sewage overflows in Plaintiffs' properties as well as other Centreville residents' properties.

## Commonfields of Cahokia

79. Defendant, Superintendent Dennis Traiteur, was appointed as the General Manager of Commonfields in September 2005. He is currently the Superintendent of Commonfields.

80. In May 2010, in prior unrelated litigation, Defendant Traiteur provided that his job duties included: daily operation of the water district, completing and presenting mandated forms to the Environmental Protection Agency, managing revenue, financial statements, personnel, budgetary issues, water projects and improvements, **developing plans for lift station rehabilitations** or **replacements**, water main replacements, **pump booster station replacements** and **upgrades**.

81. In that same litigation, Defendant Traiteur cited that as the general manager, the financial accounts were sound with "historical amounts of revenue in the accounts" including $ 1.1 million in investment accounts.[10]

---

[10] *Traiteur v. Commonfields of Cahokia Public Water District et. al*, No. 10-CH-676, 5.

82. Plaintiffs and numerous residents across Centreville have experienced raw sewage overflows from the wastewater system for minimally ten years; some Centreville residents' issues with raw sewage and stormwater overflows date back nearly fifty years.

83. Prior to, during, and subsequent to the cited time of historical revenue, Defendant Commonfields did not use this revenue to stop the recurrent flooding and sewage overflows in the known areas of Centreville and those areas occupied by Plaintiffs.

84. In a 2019 Freedom of Information Act document production to the Plaintiffs, Defendant Commonfields produced what appears to be their most recent CapaCity Management Operations and Maintenance Program (herein "CMOM"), in which they allocated zero dollars for "emergency maintenance and repairs, future equipment and infrastructure replacement and contingency funds" for the year 2013-2014. (**See attached Exhibit H excerpt from CMOM).**

85. Defendant Commonfields has been aware that lift stations and sewer systems that it services, maintains, and owns are either full (unable to take in wastewater) or inoperable, creating  the recurrent flooding and sewage overflows and increased risk of flooding to  Plaintiffs' properties as well as other Centreville residents' properties.

86. In the same February 23, 2020, article that Defendant Jackson is quoted, Defendant Traiteur, explained there is little they can do and alleged that the wastewater has nowhere to go because the lines release into East St. Louis' sewer system which he claims is backed up.[11]

---

[11] *Traiteur v. Commonfields of Cahokia Public Water District et. al*, No. 10-CH-676, 5.

87. Commonfields is on notice currently and has been on notice for nearly ten years, if not more, that the areas in which Plaintiffs live have been subject to recurrent flooding and/or sewage overflows due to failures of their pumps, equipment and overall failure to adequately maintain their sanitary sewer system. (**See Exhibit E; See also attached Group Exhibit I**).

88. To date, Defendant Commonfields has taken no actions to permanently resolve and prevent these recurrent conditions.

## GENERAL ALLEGATIONS

89. For the stormwater and sanitary sewer infrastructure within their geographic purview and boundaries, the City and Township of Centreville are charged with the responsibility to construct, maintain, and operate drains, conduits, pumping plants, ditches, channels or outlets of such capacity and character as required to carry off, and for the disposal of, stagnant or overflow water, sewage and other drainage of such district and to lay out, establish, construct, maintain, and operate all such adjuncts or auxiliary improvements or works as may be necessary or proper for the accomplishment of the purposes intended.

90. For the stormwater and wastewater infrastructure within their geographic purview and boundaries, Commonfields is charged with the responsibility to construct, maintain, and operate drains, conduits, pumping plants, ditches, channels or outlets of such capacity and character as required to carry off, and for the disposal of, stagnant or overflow water, sewage and other drainage of such district and to lay out, establish, construct, maintain, and operate all such

adjuncts or auxiliary improvements or works as may be necessary or proper for the accomplishment of the purposes intended

91. For years, the City of Centreville has had notice of the sanitary sewage overflows and stormwater overflows in the geographic region for which they are responsible.

92. As an agent of the City, Defendant Jackson knew or should have known of the history of flooding in the City of Centreville and knew that Plaintiffs (and residents living around them) who live within the geographic boundaries of City of Centreville, specifically living in the areas known as "Ping Pong" and Parkside", were prone to flooding and were at an increased risk of flooding.

93. As an agent of the Township, Defendant McCall Sr. knew or should have known the history of flooding in the Township and knew that Plaintiffs (and residents living around them), specifically living in the areas known as "Ping Pong" and Parkside", were prone to flooding and were at an increased risk of flooding; as treasurer of the road district, Defendant McCall Sr. failed to adequately allocate monies to the roads within the Township that have been devastated by ongoing stormwater flooding and sewage overflows from Defendants' broken infrastructure.

94. Defendant Commonfields and agent of Defendant Commonfields, Dennis Traiteur, knew or should have known of the history of flooding in the City/Township and knew that Plaintiffs living in the areas known as "Ping Pong" and Parkside" (and residents living around them) were prone to flooding and were at an increased risk of flooding, particularly in light of constant

ad-hoc repairs to lift stations over the years that have not resolved stormwater and sewage overflow issues.  (**See attached Group Exhibit J**).

95. Defendant Commonfields and Defendant Traiteur's prior notice of this history of flooding and increased risk of flooding to Plaintiffs in these areas is well-documented by resident complaints and letters sent to them from the Illinois Environmental Protection Agency.

96.  Prior to the recent stormwater flooding event on January 11, 2020, both Defendants were aware of the history of recurrent flooding in the City/Township of Centreville.

97. For example, in the past, representatives from Commonfields have relayed to Centreville residents that the sewers are "full" (unable to take in wastewater) and have told residents there is nowhere for the wastewater to go.

98. Defendant City of Centreville and Defendant Jackson's prior notice of this history of flooding in these areas is well-documented by letters sent to him from the Illinois Environmental Protection Agency regarding permitting issues and resident complaints about sanitary sewage overflows.  (**See attached Group Exhibits K**).

99. A 2015 broadcast from a local news station also covered a flooding event that occured in the City on Piat Place; as mentioned above, Plaintiff Fuse resides on Piat Place.[12]

---

[12] Flash flooding traps some St. Clair County residents

100. Both Defendants have received notice of these ongoing flooding and public health conditions precipitated by Defendants' use of broken lift stations and use of lift stations with insufficient capacity.

101.  Accordingly, Defendants knew or should have known about the regular recurrence of stormwater flooding and sewage overflows on Plaintiffs' properties were diverted from their respective sanitary sewer and stormwater systems.

102. Pursuant to information received from employees from Defendant Commonfields, Defendant City of Centreville purportedly maintains, owns and is responsible for at least (10) pump stations, if not twelve (12), and Defendant Commonfields owns a remaining 18 pump stations.

103. The following pump stations are owned and/or maintained by City of Centreville:

1.  Bluff and N. 82nd

2.  81st and Belleview

3.  73rd Street

4.   Near Oakland Street

5.  71st Street

6.  Ames Drive

7.  71st and Park (likely defunct and replaced with sewer line)

8.  63rd and Pittsburgh

9.  N. 63rd and Laura

10.  (56 block) Lake Drive and Beachland

      11. 75th Street, near Pershing

      12. N. 75th Street

104. Pursuant to documentation Plaintiffs obtained from Defendant Commonfields in a FOIA

request, Defendant Commonfields owns/maintains twenty-seven (27) pump stations. (**See**

**attached Exhibit L)**

105. As demonstrated between these two lists, there is considerable overlap between Defendants

as to who owns and/or maintains the lift  stations;  more than half of these lift stations are in

conditions ranging from "fair" to inoperable.

106. Plaintiffs reside in the following areas closest to lift stations at:

      1.  82nd & Belleview - listed as "station floods"—"temporary submersible."

      2.  82nd & Bluff - listed as "station floods"—"temporary submersible"

      3.  63rd and Laura - listed as "fair condition."

107. As evident from numerous internal documents, including  Exhibit L, Defendants have been

aware of the increased risk of stormwater flooding and sewage overflows to Plaintiffs (and

communities surrounding them) due to their continued use of lift stations that are "flooded" and

in "poor" condition in and near where Plaintiffs reside.

## EMERGENCY CIRCUMSTANCES

108. Based on the weather patterns from 2014 through 2018 for City/Township of Centreville in St. Clair County, the months that average the most precipitation (in order) are: April, July, August, May and June.[13]

109. This can obviously vary widely for the Plaintiffs and other residents of Centreville based on factors noted above which include: (1) a failing sewer and stormwater infrastructure that enables stagnant stormwater and sewage to remain standing in yards, ditches, and roads during times where there is **no** existing or impending rain event; and (2) each year can bring vastly different rain events and during unexpected times as evidenced by the rain event on January 11, 2020, that Plaintiff Fuse and his neighbors suffered well before the anticipated rainy season.

110. Plaintiffs urgently petition this court for relief and intervention in the midst of the current rainy season to prevent further harm to their properties and homes.

111. Both Plaintiffs are elderly and/or some suffer chronic health conditions or have elderly family members for whom they provide care.

112. Plaintiffs can no longer sustain the physical, mental and financial burdens of these dysfunctional sewer and stormwater systems and the rainy days which further exacerbate current terrible and unhealthy conditions.

---

[13] All data from the National Oceanic & Atmospheric Administration's National Environmental Satellite, Data, and

Information Service, gathered at: CENTREVILLE 1.9 E, IL US US1ILSC0011 Station, located at: Elev: 604 ft., Lat: 38.5735o NLon: -90.0660o W.

113. Absent this Court's intervention, Plaintiffs' homes and properties will be overrun with stagnant water, flooding and sewage overflow until the end of the rainy season and again at the end of the year.

114. Furthermore, Plaintiffs find themselves in impossible circumstances. They cannot sell their homes because of the sewage, water damage, and low valuations due to the water and sewer damage.

115. Yet, Plaintiffs have been denied or discouraged from applying for home improvement loans due to the low home valuations and/or inevitable and unending water damage to their respective homes.

116. Defendants have demonstrated that without court intervention they will not provide relief nor carry out their respective duties to provide an operable, safe and healthy stormwater and sewer system.

117. Additionally and equally important, with research indicating coronavirus (herein "COVID-19") can be detected in waste and uncertainty as to whether the virus can be transmitted via contact with waste, Plaintiffs find themselves in even more urgent circumstances requiring court intervention to prevent a potentially worsening public health crisis.[14]

---

[14] Wu FQ., Zhang JB, Gu XQ, Lee, WL, Kauffman, K., Hanage, WP, Matus, M., Ghaeli, N., Endo N., Duvallet, C., Moniz, K., Erickson, TB., Chai, PR., Thompson, J., Alm, EJ. SARS-CoV-2 *Titers in wastewater are higher than expected from clinically confirmed cases.*

118. If COVID-19 is determined to be infectious through contact with waste, any flooding or sewage overflows that are sure to come further threaten the lives of Plaintiffs with potential exposure.

119. This would cause devastating effects on Plaintiffs and residents throughout this community who are older and often find themselves exposed to these conditions.

120. This, along with the very serious public health implications, financial devastation and constant exposure to sewage and stormwater overflows with no end in sight, is why court intervention is imperative and urgent.

## Count I

## Section 1983 Claim for Violation of Taking Clause of Fifth Amendment to the United States Constitution

121.  Paragraphs 1 – 120 are re-alleged and incorporated herein.

122.  The Fifth Amendment to the United States Constitution provides in relevant part that private property shall not be taken for public use without just compensation.

123.  The Fifth Amendment Takings Clause is applicable to the states, and to their political subdivisions, by virtue of the Fourteenth Amendment.

124.  42 U.S.C. § 1983 provides a private remedy for those whose constitutional rights are violated by the actions of a government entity.

125.     The Fifth Amendment protects a subset of the takings prohibited by the Illinois Constitution. Therefore, any taking in violation of Article I, Section 15 of the Illinois Constitution necessarily constitutes a violation of the Takings Clause.

126.     The Defendants' actions therefore constitute a taking of private property for public use for which their actions should be enjoined.

127.     Defendants' construction, maintenance, and operation of their respective sewer and stormwater system caused an invasion of unwanted water and sewage on Plaintiffs' respective premises and homes as recently as January 11, 2020 and as far back as 1993.

128.     Defendants have provided Plaintiffs with faulty stormwater and wastewater infrastructure such that both respectively cause sewage and stormwater overflows onto the properties and into the homes of Plaintiffs causing damage to their respective properties.

129.     The flooding caused by Defendants directly, immediately and radically interfered with Plaintiffs' enjoyment and use of their land.

130.     Defendants have diverted or caused raw sewage and stormwater to flow onto the properties of Plaintiffs such that they have incurred special damages to their respective properties including contaminated water on their land and in their homes, inability to utilize the property as originally intended when purchased, and devaluation of property.

131.     The flooding caused by stormwater and sewage released by Defendants' stormwater and sewer systems and onto Plaintiffs' properties was recurrent and well-known to Defendants.

132.     The flood waters were diverted and released from Defendants' respective stormwater and sewer systems to Plaintiffs' properties by intentional and negligent acts of Defendants.

133.     The flood waters, stagnant waters and/or sewage remains on Plaintiffs' properties for prolonged periods of time such that their property is unable to be fully used as a result of the flood waters.

134.     The flooding that Plaintiffs have experienced was reasonably foreseeable to Defendants and Defendants should have known that the flooding would occur.

135.      The damage inflicted to Plaintiffs' respective homes has cost them thousands of dollars over the last several years and continues to cost this much as the damage continues to mount with damaged flooring, walls, hot water heaters, and furnaces, and mold occurring due to the flooding.

## Count II

### Violation of the Eminent Domain Clause of the Illinois Constitution

136.     Paragraphs 1 - 120 are re-alleged and incorporated herein.

137.     Article I, Section 15 of the Illinois Constitution provides that, "Private property shall not be taken or damaged for public use without just compensation."

138.     Section 15 requires just compensation for two distinct types of injuries: the taking of private property and damage to private property for public use.

139.     Defendants' actions therefore constitute a temporary taking in violation of Section 15, Article I of the Illinois Constitution for which just compensation is required.


WHEREFORE, Plaintiffs Earlie Fuse and Cornelius Bennett pray this honorable Court enter judgment in their favor and against Defendants as follows:

A. Preliminary and permanent injunctions:

1. Restraining Defendants City of Centreville (also possibly known as or doing business as Alcentra) and Township of Centreville from depositing or diverting its stormwater onto Plaintiffs' properties;

2. Restraining Defendants City of Centreville (also possibly known as or doing business as Alcentra), Township of Centreville and Commonfields from depositing or diverting its wastewater onto Plaintiffs' properties;

3. Requiring Defendants City of Centreville (also possibly known or doing business as Alcentra), Township of Centreville and Commonfields pursuant to the recommendations of a credentialed and qualified party to whom all parties agree, immediate replacement of all pump stations with pumps to be working at adequate capacity at any locations designated as "fair", "poor" or "flooded" conditions within 30 days of entry of this order. (**See Exhibit L**).

4. Requiring Defendants City of Centreville (also possible known as or doing business as Alcentra), Township of Centreville and Commonfields to prevent deposit or diversion of wastewater from those systems onto Plaintiffs' properties, with the installation of new pump/lift stations including, but not limited to, the

installation of sewer lines as replacement for pump stations where agreed upon by parties as necessary.

5.   An order for equitable relief to remediate the harm caused by Defendants' unconstitutional conduct, including the appointment of a monitor to oversee the respective operations and replacement for new pump stations to Defendants' sanitary sewer system(s), construction and improvements needed to repair Plaintiffs' homes damaged by Defendants' broken infrastructure to include any construction and/or monies disbursed related to these improvements for a time period deemed appropriate by the court.

6.   For such other relief as the Court deems just and proper.

## **Jury Demand**

Plaintiffs demand trial by jury on all issues which are triable by a jury.

Respectfully submitted,

/s/Nicole D. Nelson

31

Nicole. D. Nelson

IL Bar No. 6300417

Attorney for Plaintiffs

EQUITY LEGAL SERVICES, INC.

5720 N. Belt West

 Suite 20-267

 Belleville, Illinois 62226

 P: 618.693.9800

 F: 618.693.980

 nnelson@equitylegalservices.org

Respectfully submitted,

/s/ Kalila J. Jackson

Kalila J. Jackson, # 61964

METROPOLITAN ST. LOUIS EQUAL

HOUSING & OPPORTUNITY COUNCIL

Attorney for Plaintiffs

1027 S. Vandeventer Avenue, Sixth Floor

St. Louis, MO 63110

Telephone: (314) 534-5800 x 7007

Email: kjackson@ehoc-stl.org

DATED: June 5, 2020