**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS, ILLINOIS**

| | | |
|---|---|---|
| CORNELIUS BENNETT and | ) | |
| EARLIE FUSE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 3:20-cv-00530-DWD |
| vs. | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| CITY OF CENTREVILLE, et. al. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' JOINT**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Cornelius Bennett and Plaintiff Earlie Fuse pray this honorable Court deny

Defendants Joint Motion for Summary Judgment. Defendants request that this Court enter

summary judgment against Plaintiffs based on an affirmative defense—that they are immune

from Plaintiffs' tort claims under Illinois' Tort Immunity Act—and that there is no issue of

triable fact with respect to Plaintiffs' federal and state constitutional takings claims.

Both contentions fall flat. Defendants waived their immunity defense by waiting to raise

it for the first time now, after filing multiple answers and a motion to dismiss, and after the

extensive discovery period has concluded. Even if Defendants have not waived their immunity

defense, the record demonstrates that there is an issue of triable fact as to their immunity; over

their decades of failures, Defendants were not actually weighing costs and benefits and making

discretionary policy decisions, but rather acting in such a haphazard manner as to preclude

immunity. In any event, even if they were immune under the Tort Immunity Act, the Act would

only immunize Defendants from damages, not from Plaintiffs' claims for injunctive relief.

Finally, Defendants' actions also constitute takings pursuant under the federal and Illinois

constitutions: Rather than a simple failure to act, Defendants acted in a manner that foreseeably caused the sewage and stormwater damage to Plaintiffs' properties.

## <u>PLAINTIFF'S RESPONSE TO DEFENDANTS STATEMENT OF FACTS</u>

Defendants presented their Statement of Facts in narrative format and not in numbered paragraphs. For clarity, Plaintiffs have responded to the following disputed factual assertions in the order presented by Defendants:

A.      **Plaintiffs Cornelius Bennett and Earlie Fuse reside in the City of Centreville in areas known as "Parkside" and "Ping Pong."** (Defendants' Statement of Facts, p. 2)(referred to hereafter as "Defs.' SOF."). **Disputed material fact**. Plaintiff Earlie Fuse does not live in Parkside. He lives in an area known as Piat Place (5951 Piat Place). Fuse Dep. 60:21-23,78:10-13.

B.      **The city also maintained certain flood control and stormwater ditches throughout the community.** (Defs.' SOF, p. 3). **Disputed material fact**. As the mayor of Centreville for 14 years (2007-2021), Defendant Marius Jackson did not know where Centreville stormwater ditches such as WPA ditch or Canal 1 were located. He did not know if his staff was maintaining these flood control mechanisms. He was also unaware of the City's contractual obligation to maintain these tributaries. Jackson Dep. 23:5- 9, 95:5- 113:3. Testimony by former Centreville Public Works Supervisor, Corey Allen, and documents the City received from the Illinois Department of Natural Resources further demonstrate the failure to maintain ditches stretching back as far as 1997 to the present day. Allen Dep. 27:10-29:4. *See also* **Group Exhibit F**.

C.      **The mayor of Centreville is a part-time job, and thus Mayor Jackson worked full time as a letter carrier for the U.S. Postal Service during his tenure, as well as volunteering as a firefighter and working in other public service roles.** (Defs.' SOF, p. 3).

**Disputed immaterial fact, in part**. The Mayor of Centreville is not a part time job. Defendant Jackson chose to occupy the role of mayor on a part time basis. Jackson Dep. 26:3-27:13. Defendants present no evidence to support their assertion—nor does the Illinois Municipal Code reflect such a limitation. *See* 65 ILCS 5/et eq.

  D. **In this part-time role, Mayor Jackson was not intimately involved in the day to day operation of the City's stormwater and wastewater infrastructure, and instead relied upon staff with more knowledge.** (Defs.' SOF, p. 3). **Disputed material fact**. This is controverted by Defendant Jackson's own assertion in his Motion for Summary Judgment that he "ordered that stormwater ditches in the City be installed and maintained."[1] Defendant Jackson was responsible for hiring of staff, and staff reported to Defendant Jackson to update him on day-to-day issues and to obtain his permission for the commencement of tasks in the field. Defendant's Motion for Summary Judgment, Doc. No. 142; Gentry Dep. 42:5- 42:22, 28:20 -29:5; Allen Dep. 29:5 -30:2; Millard Dep. 46:13-49:5. Defendant Jackson also did not rely on knowledgeable staff. Corey Allen was hired by Defendant Jackson to run the street and sewer department without any training or experience with lift stations or sewer systems. City Treasurer, Erma Millard, received no training for her role and did not prepare budgets or annual reports during her 8-year tenure. Allen Dep. 59:6 – 59:18; Millard Dep. 38:4 – 40:3. Lamar Gentry, also the City's Finance Director and FOIA Officer, did not submit the city's audits to the state of Illinois for 3 years (2016-2018)[2] and submitted no audits for the TIF District. Gentry Dep. 52:11 – 54:24, 106:1 -107:14. *See* **Exhibit H**.

---

[1] The record is replete with examples that the city was not maintaining the stormwater ditches during former Mayor Jackson's tenure. (*See* **Group Exhibit F**).

[2] Defendant Gentry is currently the TIF administrator for Cahokia Heights. Cahokia Heights has not submitted any audits to the State of Illinois Comptroller's Office since its merger on May 6, 2021. (*See* **Exhibit G**, Landing Page of State of Illinois Comptroller's Office).

E.      **Ultimately, Mayor Jackson was hamstrung by the financial situation at the City, where they could barely make payroll.** (Defs.' SOF, p. 3). **Disputed material fact.** LaMar Gentry, former TIF consultant for the City of Centreville, testified that the City generated approximately a quarter of a million dollars each year from its TIF District. Gentry Dep. 45:24-50:5. Despite repeated requests from Plaintiffs since November of 2020, Defendants refused to produce records such as budgets, audits, or other documents to demonstrate the City's financial status.[3] Erma Millard, treasurer for the City of Centreville for 8 years, testified that "there was no budget." Millard Dep. 38:21- 39:7.

F.      **Among other City staff, Mayor Jackson relied on Defendant La Mar Gentry, who was the TIF consultant for the City of Centreville from 2012 through 2018, and the City Administrator for the City from 2018 through the date of the merger.** (Defs.' SOF, p. 4). **Disputed immaterial fact, in part.** Defendant Gentry occupied numerous, overlapping roles for the City, none of which were restricted by certain dates or time periods, including as TIF consultant when he participated in making decisions on how and where funding would be allocated in the city. Gentry Dep. 25:13-24, 35:10- 36:7. As Defendant Gentry acknowledged, "I was everything…that's what I got paid to do whatever came across my desk."  Gentry Dep. 42:23-43:24.

G.      **But he understood that the City's efforts to repair and maintain its stormwater and wastewater infrastructure were a "BAND-AID" and that "the whole system needed to be overhauled" to really fix things the right way.** (Defs.' SOF, p.3). **Disputed material fact.**

---

[3] Counsel for Defendants requested until October 12, 2023 to supplement its responses to discovery originally requested on November 2, 2020—discovery Plaintiffs requested again in a deficiency letter on March 2, 2022, and again in a second deficiency letter on August 3, 2023. Further, Defendants produced 4,390 pages of discovery to Plaintiffs on September 21, 2023, and an additional 4,358 pages on September 27, 2023. Notably, discovery closed on August 22, 2023, per this court's scheduling order.

The City's lack of planning and onboarding of experienced staff is inconsistent with meaningful effort. Instead, the City had a treasurer who never submitted or reviewed a budget in 8 years; failed to submit audits to the State of Illinois for at least 3 years; hired a Public Works supervisor over the City sewer department and drainage ditches who had no experience with sanitary sewer systems, lift stations, drainage ditches and received no training on any of the matters from the City; and had impaired stormwater control ditches and canals for over 20 years. Plaintiffs also incorporate paragraph 1B herein. Wobig Dep. 62:3-70:4; Jackson Dep. 23:5- 9, 95:5- 113:3; Allen Dep. 20:1 – 20:24, 57:18-58:1; *See also*, **Group Exhibit F.**

H. **Despite his efforts to look for and obtain additional funding to address the City's infrastructure woes, sufficient grant funding was not available during his tenure.** (Defs.' SOF, p. 3,4). **Disputed material fact**. There is no evidence that there was no grant funding available for the 13 years Defendant Jackson was mayor. Defendant Jackson testified he "wouldn't necessarily [look for grants]" and did not have a "practice" of asking; he checked in with Defendant Gentry "when quarter came around, 'was there any grant money.'"  Prior to 2019 and 2018, Defendant Jackson could not recall the last time he reached out to county, state or other agencies for flooding resources for the community of Centreville. Jackson Dep. 231:24 -234:24, 236:10- 22.

I. **In these roles, Mr. Gentry did not supervise, or direct day-to-day work being done on the stormwater or wastewater infrastructure.  But he became knowledgeable about the flooding and infrastructure issues facing the City, as he attended meetings with local politicians, sought funding opportunities for the City, and approved expenditures for repairs.** (Defs.' SOF, p. 4). **Disputed material fact.**  Defendant Gentry participated in decision-making meetings related to funding for stormwater and sewer projects; he frequently met with and

was the point of contact for City engineers, Hurst-Roche, and was the main point of contact and provided directives for some of the day-to-day duties of public works supervisor, Corey Allen. Allen Dep. 70:11- 71:23, 99:13-101:6, 103:20-104:3, 109:19 -110:12; Gentry Dep. Vol 2., 19:10-22:10, 53:23-54:17.

J.      **Prioritization for these grants was based on the condition of the infrastructure requiring repair.  And Mr. Gentry allocated City funds when repairs needed to be completed that could not wait for grant funding.** (Defs.' SOF, p.4). **Disputed material fact.** Defendant Traiteur testified that no prioritization list existed. Traiteur Dep. 114: 10-16.

K.      **Ultimately, however, these grants, ongoing repairs, and local funding could not solve the City's flooding and sewer problems, because the City lacked the funding to complete the type of wholesale repairs required to do so.** (Defs.' SOF, p.4). **Disputed material fact** for the reasons set forth in paragraph 1G and 1H herein.

L.      **While Mr. McCall was well aware of the flooding issues affecting the Township—indeed, Plaintiff Fuse came to him with his concerns—he was hamstrung by the Township's inability to fund the type of repairs that would be necessary to handle the stormwater inundating the area of the Plaintiffs' homes.** (Defs.' SOF, p.5). **Disputed material fact**. The Township submitted minimal responsive discovery to Plaintiffs' requests, including no documents reflecting the Township's funding, budgets, grants, maintenance, or studies undertaken to reflect the Township or McCall's purported inability to address the flooding. Defendant Gentry testified that the Defendant Township did have funding: "[the Township] may pay for a pump station or lift station… if it's in Centreville the Township has paid for it and vice versa…" *See* **Exhibit I**.; Gentry Dep. 36:8-37:24.

M.      **Commonfields owned and operated the majority of the sewer system and related wastewater infrastructure in the area that is now Cahokia Heights, and provided sanitary sewer services to the Plaintiffs prior to June 2021.  Similar to the other Defendants, Commonfields faced budgetary struggles, and made difficult choices about repairing versus replacing aging infrastructure based on the cost to residents.** (Defs.' SOF, p. 5**). Disputed material fact**. Plaintiffs' dispute Defendants' characterization of Commonfields' role to the extent that it excludes the role of Defendant City. Defendant City Centreville also provided the conveyance of sanitary sewer waste and was also responsible for lift and pump station repairs and outsourcing repairs to vendors. Traiteur Dep. 14:22 – 15:24. 15:9-24 Allen Dep. 59:6 – 59:18, 83:3-83:16. Aware of issues in the system at least since 1993, Defendant Traiteur testified that no studies, scope of work, or other related documents were prepared during his tenure (1993-2021) to reflect what the actual cost would be to repair the system infrastructure, such as infiltration and inflow, nor were any such documents requested by the board.

N.      **Mr. Traiteur and Mr. McCall frequently met to discuss issues in the Commonfields sewer system, specifically regarding the need for significant upgrades to the sewer system and the lack of available funding.** (Defs.' SOF, p. 5).  **Disputed material fact**. Defendant Traiteur testified only that the two discussed "random operations of the water and sewer district." Traiteur Dep. 28:3-28:22. Despite Defendants Traiteur and McCall's awareness of the significant upgrades needed and the purported lack of funding, Defendant Traiteur did not request funding from the board to fund these upgrades, Defendant McCall did not direct him to do so, and no priority list of repairs existed to attend to urgent lift stations such as where Plaintiffs resided. Traiteur Dep. 109:10 – 114:22.

O.      **And on multiple occasions, Mr. Traiteur discussed more significant upgrades to the system with the Commonfields' board, but the board did not want to raise sewer rates on the community in order to fund these repairs.** (Defs.' SOF, p. 5). **Disputed material fact.** The board was not operating with full information. Plaintiffs incorporate paragraph **1N** herein.

P.      **As a result, Mr. Traiteur was tasked with presenting the board with capital improvement plans based on the current needs of both the water and wastewater systems, which would allow the board to decide what could be completed based on the currently available funding and whether it was reasonable to raise rates on its customers.** (Defs.' SOF, p. 6). **Disputed material fact.** Plaintiffs incorporate paragraphs **1M** and **1N**.

Q.      **After struggling to sufficiently fund and carry out government operations on their own, the City merged with the Villages of Alorton and Cahokia to create Cahokia Heights in May 2021.** (Defs.' SOF, p.6). **Disputed material fact.** Defendant City failed to submit records to reflect its financial status during the discovery period. Paragraphs 1E and 1H are incorporated herein.

R.      **Cahokia Heights still faces many challenges—including the continued inundation of certain areas with runoff from the bluff area—and there is a great deal of work to be done to address the stormwater, flooding, and wastewater issues in the community.** (Defs.' SOF, p. 6). **Disputed in part, material fact**, to the extent Defendants' summary seeks to exclude Defendants' lack of maintenance of ditches and canals as contributors to the stormwater flooding Plaintiffs experience. This inundation from the bluffs does not include Piat Place. *See* Jose Constantine Dep. 24:18-25:5. **Paragraphs 1B and 1G** are incorporated herein.

8

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS

a.　　Defendant Commonfields' sanitary sewer system began experiencing issues such as inflow and infiltration ("I&I") as early as 1993. Defendant Traiteur acknowledged that this I&I contributes to sewage backups onto resident's properties. Dennis Traiteur Dep. 38:21-39:20. Defendants did not maintain stormwater ditches, canals, and other flood control mechanisms in the City of Centreville; some, including the WPA ditch and Canal 1, went without maintenance for over 20 years. *See* **Group Exhibit F;** Jackson Dep. 23:5- 9, 95:5- 113:3.

b.　　Plaintiff Fuse purchased his home in 1992 and began to experience flooding in 1993. He is currently 82 years old and has experienced flooding at his home 5-6 times per year from 1993 to the present. Fuse Dep. 34:12-35:16, 63:15-69:24, 140:04-155:22.

c.　　When Plaintiff Fuse's home and property floods, it can take 6-7 days for water to be pumped out. Fuse Dep. 90:20-92:14. Plaintiff Fuse's basement is always full of water and mud. Fuse Dep. 30:13-19. His basement, previously used as a living and storage space, has not been usable since 1993. Fuse Dep. 12:19-13:6, 18:22-19:3. Plaintiff Fuse has raised concerns about the unwanted flooding and subsequent damage occurring at his home to the municipality and raised the same about the sewer problems to Commonfields of Cahokia. Fuse Dep. 54:24-58:17, 58:17-60:15, and 107:23-109:22.

d.　　Plaintiff Cornelius Bennett purchased his home located on 80 N. 80th Street (in the Ping Pong area) in 1986. Bennett Dep. 6:7-8:19.

e.　　Plaintiff Bennett first experienced raw sewage at his property in the late 1980's and early 1990s when sewage came from the ground in the ditch. His wife complained to the Centreville Township about the unwanted sewage on their property. Bennett Dep. 112:12-114:2, 125:4-11. For many of the 38 years Mr. Bennett has lived at his home, he has not seen anyone performing maintenance or repairs except for patching a water leak on 82nd Street. Raw sewage in

his ditch has remained unresolved; ongoing flooding creates a lake on one side of his homeBennett Dep. 40:16- 41:9, 46:23-47:5.

f.      Over the years, Plaintiff Bennett has been unable to enjoy his property as intended. He cannot sit outside or use the back patio for family barbeques and his grandkids cannot play in the backyard, because of the raw sewage that overflows the nearby sewage pipe and the smell of the raw sewage in his yard. Bennett Dep. 52:7-53:9, 56:2-57:23, 116:19-117:12. As of November 2, 2022, twenty-two sewer failures were identified in the City's sewer system. At the time of this filing, sewer failures exist where Plaintiffs reside. *See* **Exhibit M**.

## LEGAL STANDARD

Summary judgment is a "drastic method and should only be allowed when the right of the party to invoke that drastic method is free from doubt," *Interlake, Inc.v. Harris Trust and Sav. Bank*, 57 Ill. App. 3d 524, 526 (1st Dist.1978), and there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). The court must "consider all of the evidence in the record in the light most favorable to the non-moving party" and "draw all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)

## ARGUMENT

### I.   Defendants' Belated Immunity Arguments Are Unavailing.

The Tort Immunity Act provides an affirmative defense for specific government functions. *See Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill.2d 335, 341 (1998). Defendants have waived any defense under the Act by choosing to raise it for the first time on a motion for summary judgment, after they have answered Plaintiffs' complaint; moved to dismiss Plaintiffs' case; and only when the extensive discovery period in this case has closed—denying

Plaintiffs the opportunity to test Defendants' immunity-related assertions. *See Van Meter v. Darien Park District,* 207 Ill.2d 359, 370 (2003). Even if they have not waived this defense, they are not immune: Any immunity defense "must be strictly construed against the public entities involved," *id.* at 380, and there is a question of triable fact over whether Defendants' multi-decade failure to make necessary repairs reflects discretionary decisions. Finally, the Tort Immunity Act in no way shields Defendants from Plaintiffs' claims for injunctive relief.

**A. Defendants have waived their immunity defense under the Tort Immunity Act.**

As Illinois courts have repeatedly explained, including in the specific context of the Illinois Tort Immunity Act, "in order to avoid surprise to the opposite party, an affirmative defense"—like immunity under the Tort Immunity Act—"must be set out completely in a party's answer to a complaint and failure to do so results in waiver of the defense." *Hanley v. City of Chicago*, 343 Ill. App. 3d 49, 53 (1st Dist. 2003); *see also, Best v. City of Portland*, 554 F.3d 698, 700 (7th Cir. 2009). Here, prior to their motion for summary judgment, Defendants never suggested—let alone stated in any one of the answers they have filed—that they intended to argue that they were immune from liability under the Tort Immunity Act. Their failure to do so denied Plaintiffs the opportunity to use discovery to contest the factual assertions Defendants now argue demonstrate immunity. As a result, Defendants have plainly waived any immunity defense.

Defendants filed three separate answers to Plaintiffs' Amended Complaint. *See* Doc. Nos. 62, 64, 65. Those answers identified a number of defenses Defendants intended to raise in this case. *See id*. at 25-26 (noting defenses of equitable estoppel, the statute of limitations, and laches). But Defendants nowhere suggested that they intended to argue that they were immune under Illinois' Tort Immunity Act. Indeed, at no point have Defendants previously argued that

11

they are immune under the Tort Immunity Act—even though certain Defendants unsuccessfully argued in their opposition to Plaintiffs' motion for a preliminary injunction that a *different* form of immunity, "the Public Duty Rule," protected their actions. Doc.. 40, at 5-6.[4]

Defendants' failure to timely (or otherwise) raise their immunity defense under the Tort Immunity Act denied Plaintiffs the opportunity to use discovery to challenge the factual assertions Defendants now claim demonstrate that they are immune under the Act. *See* Doc. 142 at 8-9. As discussed further below, the record thoroughly establishes that Defendants are not in fact immune under the Act. But Defendants' failure to raise their defense under the Tort Immunity Act prevented Plaintiffs from using depositions or requests for productions more directly to counter Defendants' after-the-bell argument that they acted pursuant to a plan and so were "were balancing competing interests and making continued and ongoing judgment calls as to what set of action would best serve those competing interests." *See* Infra IB (discussing requirements for immunity under the Tort Immunity Act); Doc. 142 at 8 (quoting *Nichols v. City of Chicago Heights*, 2015 IL App (1st) 122994, ¶¶ 33-41).

Consider, for example, Defendants' belated production of more than 8000 pages of discovery last month—*after* Defendants filed their motion for summary judgment and more than a month after the close of discovery in this case.[5] Those documents included years of audits that revealed significant financial mismanagement by Defendants with respect to Defendants' control over sewer funds. *See* **Exhibit J**. Had those records been produced in a timely fashion—and had Plaintiffs been aware that Defendants intended to argue that they were immune under the Tort

---

[4] Making Defendants' waiver of their immunity defense all the clearer here is the fact that Defendants only recently filed a (belated) motion to dismiss in this case. Defendants' motion was inappropriately timed then, but at least discovery was still formally proceeding at that point.

[5] Plaintiffs are still reviewing the belated production and considering whether to move strike all or part of this production if Defendants seek to put any of the documents into the record.

Immunity Act—Plaintiffs would have had the opportunity to depose Defendants' witnesses to demonstrate that financial mismanagement, not financial hardship or permissible policy determinations, caused or contributed to Defendants' tort violations, such that immunity does not apply. Plaintiffs also could have more directly pressed Defendants and Defendants' witnesses with respect to whether or not they were carrying out a plan, which would determine whether or not Defendants are immune. *See Nichols*, ¶¶ 33-39.

Excusing Defendants' waiver or allowing Defendants to amend their answers now, three months before trial, would be highly prejudicial to Plaintiffs. *See Donath v. Village of Plainfield*, 2020 IL App (3d) 190762, ¶18  ("In the context of the Tort Immunity Act, 'an affirmative defense is not waived, despite the fact that it was not raised in an answer to a complaint, if the defense is *subsequently raised without objection* in a motion for summary judgment.'"); *Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005) (excusing waiver of affirmative because plaintiff "was not prejudiced; he was aware of the exhaustion issue even when he filed his complaint, and he confronted the defense in responding to the motion for summary judgment"); *see*  735 § 5/2-616. Here, Defendants have not only sprung immunity under the Tort Immunity Act on Plaintiffs as an impermissible "surprise," but they have done so in a way that would maximize the prejudice to Plaintiffs.

### B.  Even if Defendants have not waived their immunity defense, they are not immune for the failures at issue.

The purpose of the Tort Immunity Act is "to protect local public entities and public employees from liability resulting from the *operation of government*." *Ware v. City of Chicago*, 375 Ill. App. 3d 574, 577-78 (1st Dist. 2007) (emphasis added). Immunity covers "those decisions which require the municipality to balance competing interests and to make a judgment call as to what solution will best serve each of those interests." *West v. Kirkham*, 147 Ill. 2d 1 at

11 (1992). That is, for immunity to apply, local public entities must make cost-benefit analyses over difficult decisions—not avoid those decisions for decades. *See Nichols* at ¶ 38 ("For immunity to apply, a defendant's act or omission must be both the determination of policy and "the exercise of discretion." (internal quotation marks and citation omitted)); *see also*, *Page v. Village of Coal City*, 2022 Il App (3d) 190320-U, at 7 (granting immunity where defendant made a "conscious decision to [temporarily] refrain from paving the graveled area…based on economic and safety reasons in that it was more cost effective"). Rather than permissible discretionary decisions, however, Defendants failure over multiple decades to remedy or prevent the damage to Plaintiffs' homes reflects a complete failure to plan, financial mismanagement, and the *avoidance* of the types of assessments and choices necessary for immunity to attach.

As Illinois courts have made clear, "[a] municipality seeking immunity under section 2-201 for the failure to repair a defective condition 'must present sufficient evidence that it made a conscious decision not to perform the repair. The failure to do so is fatal to the claim." *Andrews v. Metro Water Reclamation Dist. Of Greater Chicago,* 2019 IL 124283, ¶ 31; *see also, Robinson v. Atchison, Topeka and Santa Fe Ry. Co.*, 257 Ill. App. 3d 772, 776 (3rd Dist. 1994). Indeed, "in the absence of a conscious decision on the part of the municipality, nearly every failure to maintain public property could be described as an exercise of discretion which constitutes an impermissibly expansive definition of discretionary immunity." *Andrews*, 2019 IL 124283 at ¶33.

Here, over multiple decades, as Defendants and their witnesses repeatedly testified, Defendants made no plan for how, or conscientious effort to, operate or repair Defendants' sewage and stormwater infrastructure. At bottom, Defendants argue that cost considerations were paramount in forcing Defendants' hand with repairs. *See* Doc. 142 at 9; Doc.142 Ex. D at 5-6

(claiming that board "would have to raise the rates dramatically to make the infrastructure repairs" and "the board did not want to impose the type of rates it would take to [repair] that system"). But Defendants themselves freely admitted that they never tried to determine the actual costs of repairs. Defendant McCall offered that "in his *opinion*" it would have cost "millions of dollars," *id*. at 276, and the City would "need[ ] to raise the rates in order to fix [it]."  But Defendant McCall confirmed that there was never "any balance [made] to consider the cost of what it would take to fix the issue and what it was costing residents and the damage to their homes." C. McCall Sr. Dep. 278:17-23. In fact, in the *ten* years after Mr. Fuse came to Defendant McCall "with reference to the storm water" issues, Doc. No. 142 Ex. C at 276:2 -11, the only cost assessment Defendant McCall could recall was the one prepared by Hurst Roche *after* this litigation commenced. C. McCall Sr. Dep. 278:6-12.  Defendant Traiteur revealed the same: He did not have anyone "scope out" the cost, nor did he make any presentations to the board to "show[] them how much it was going to cost in order to resolve the inflow and infiltration issue." Traiteur Dep. 112:11 – 18. Indeed, Defendant Traiteur stated that he did not know the approximate cost to resolve the system issues—nor were any engineer estimates produced to assess the cost of repairs. Traiteur Dep. at 112-113.

Defendants also never actually sought to remedy the financial constraints they claimed to operate under in anything approaching a "conscious" manner.[6] Defendants had no real budgetary process: City Treasurer, Erma Millard, for example, received no training for her role and did not prepare budgets or annual reports during her 8-year tenure. Millard Dep. 38:4 – 40:3; Allen Dep. 59:6 – 59:18. Defendants point to excerpts from LaMar Gentry's deposition to show that the city "sought funding opportunities." Doc. 142 at 4. However, Defendant Gentry clarified that his

---

[6] And certain Defendants may, in fact, have mismanaged funds in a manner that caused the financial hardship, as Defendants' recent belated document production suggests. *See* **Exhibit J**.

"meetings with local politicians" were in fact infrequent "social" dinners that stopped taking place in 2018. Gentry Dep. 12:3-13:3, Vol. 2. And there is no evidence that Defendants actually sought sufficient funds to match grants that could have provided sufficient funding to make the necessary repairs in nearly twenty years. Gentry Dep. 15:2-15:22; Jackson Dep. 231:24 -234:24, 236:10- 22.

The same failures to make any long-term planning or conduct any cost-benefit analyses mark the actual failures by Defendants to implement or make repairs. No Defendant created a priority list of repairs.  *See* Traiteur Dep. 109:10 – 114:22. Defendant Traiteur, for example, stated he and Defendant McCall discussed only "random operations of the water and sewer district." Traiteur Dep. 28:5-28:22. Even the limited instances in which Defendants *did* conduct inadequate repairs demonstrate not discretionary activity, but highly sporadic acts made with no evidence of any assessment of how to prioritize or conduct repairs in a cost effective (or just effective) manner or a credible judgment call as to whether they could actually afford to make the necessary repairs. *See, e.g.*, Doc. 142 Ex. A (describing Defendant Jackson's decision to have ditches dug and cleaned out *over a decade ago*, but failing to provide any evidence that the decision to allow the ditches to fall into disrepair was the result of a conscious judgment call); *see also,* K. McCall Dep. 36:23-38:3;42:11-16. Defendant Gentry even acknowledged that employees often made repairs "without [his] approval" and he simply "provide[d] funding and assistance" and no oversight to ensure that all lift stations in need of repairs were being considered fairly. Gentry Dep. Vol. 2, 26:1-24.

Defendants can point to no analogous case to demonstrate such a sweeping reach for immunity. Defendants' reliance on *Nichols v. City of Chicago Heights* is misplaced—to put it mildly. As an initial matter, that case involved a *single* flood—not decades of regular sewage and

stormwater overflows. *Nichols*, ¶ 1. And, as the appellate court described, the municipal defendants had taken a number of discrete acts that demonstrated discretion. In particular, the court repeatedly noted that letters from the mayor "evidence that the City had a plan which it was implementing" before the flood: the city had "a plan that "serve[d] as an expansion of [the City's] current [sewer] rehabilitation program by outlining tasks and budget assignments designed to bring the [sewer] system into compliance"; there were "system investigations and systematic rehabilitation designed to remove, isolate and pinpoint Inflow/Infiltration (I/I) sources throughout the City's sanitary sewer transport system"; and the city had systematically acted to improve its infrastructure, including "retiring sewer improvement debt," "authoriz[ing] over $1,100,000 in private sector and public sector investigations to isolate and identify sources of infiltration and inflow," inspecting all manholes, and "dye water flood testing . . . 137 high priority locations." *Id*. at ¶ 34-35. Indeed, the letter concluded with the mayor outlining a proposed, year-by-year compliance schedule for 2006 to 2014, which was set to begin being implemented prior to the flooding that damaged plaintiffs' property. *Id*. at ¶ 6. These measures— and many others, *see id*. at 34-39—demonstrated to the court that "City was acting in its discretionary capacity, that is, acting in a manner requiring deliberation and the exercise of judgment." *Id*. at ¶ 37.

By contrast, here, to the extent Defendants had a "plan" that allowed them to "prioritize" certain repairs over others, that plan could only be described as an effort to operate their government so inadequately and haphazardly, over decades, as to deny Plaintiffs of any opportunity to be free from the defects of Defendants' infrastructure. But, "[i]n the absence of a judgment call and a weighing of risks and benefits, there is nothing to protect" through immunity. *Andrews*, 2019 IL 124283 at ¶ 41. *See also*, *Monson v. Doyle*, 2018 Il 122486

(denying immunity where the City failed to present evidence of which factors were considered in deciding not to repair the sidewalk).

**C. Even if Defendants were immune under the Tort Immunity Act, they are not immune from Plaintiffs' injunctive relief claims.**

As the Tort Immunity Act establishes, "nothing in this Act affects the right to obtain relief other than damages against a local public entity or public employee." 745 ILCS 10/2-101 Thus, Plaintiffs' claims for injunctive relief are not barred by any finding of immunity under the Act. *See Davis v. City of Chicago*, 481 F.Supp.3d 757 (ND Il 2020) (state law claims for declaratory and injunctive relief not barred by the Tort Immunity Act).

**II. Defendants are liable for taking Plaintiff's property.**

Plaintiffs have also sufficiently established a Takings claim under the Fifth Amendment of the United States Constitution and Article I, Section 15 of the Illinois Constitution. The City of Centreville has taken a permanent flowage easement through the intermittent flooding and sewage overflows over Plaintiffs' properties, constituting a *per se* taking. *See Ideker Farms, Inc. v. United States*, 71 F.4th 964, 978–81 (Fed. Cir. 2023) ("[permanently recurring flooding] that results from government action is a categorical physical taking") (citing to *Ridge Line, Inc v. United States*, 346 F.3d 1346, 1355-56 (Fed Cir. 2003)). *See also, id.* at 979 ("That intermittent (as opposed to continuous) yet permanently recurring occupations are ***per se*** takings is not a new concept—'There is no difference of kind, but only of degree, between a permanent condition of continual overflow by backwater and a permanent liability to intermittent but inevitably recurring overflows; and, on principle, the right to compensation must arise in the one case as in the other'.") (quoting *United States v. Cress*, 243 U.S. 316, 328 (1917)). Further, neither sanitary sewer districts, nor drainage districts are exempt from Takings liability. *See Sanitary Dist. of Chicago v. Commonwealth Edison Co*., 357 Ill. 255, 260, 192 N.E. 248, 250 (1934) and *E. Side*

*Levee & Sanitary Dist. v. Mobile & R.R. Co.*, 279 Ill. 319, 116 N.E. 727 (1917). Defendants

disagree in their Motion, arguing Plaintiffs' Takings claims fail because Plaintiffs cannot

establish that the alleged harm arose out of any governmental action. Doc. 142 at 10. Defendants

are incorrect.[7]

 The record demonstrates that the damage caused to Plaintiffs' properties has been a direct

result of Defendants' many inadequate and negligent ***actions***. Defendants' post hoc repairs on as

needed bases or only in response to Government communications or violation notices, Allen

Dep. 46:5-47:5, *see* **Exhibit L**- IEPA Letters; their actions in turning off lift stations that resulted

in sewage overflows on Plaintiffs' properties, *see* K. McCall Dep. 67:19-69:12; in entering into

intergovernmental agreements in 1997 to repair and replace culverts and maintain ditches that

never occurred, *see* **Group Ex. F**- IDNR IGAs; in the City of Centreville not putting a CMOM

in place and Commonfields not following the existing 2014 CMOM, *see* **Exhibit K**; and all

Defendants' actions in negligently hiring employees with no experience, training, or licensing in

wastewater and stormwater system management even though they had knowledge they would be

put in charge of such systems. *See* Allen Dep. 19:1-19:14, 24:23-26:15, 29:8-30:2; Pace Dep.

26:14-27:1, 27:5-27:11; C. McCall Sr. Dep. 82:3-83:23. These actions, taken by all Defendants

in conjunction with one another show a mismanagement of both the stormwater and sewer

---

[7] It is important to note Article 1 Section 15 of the Illinois Constitution states that "private property shall not be taken or damaged for public use without just compensation as provided by law. *See* Il. Cost. art. 1, § 15. This is more expansive than federal Takings law under the Fifth Amendment. "Property is considered damaged for purposes of the takings clause if there is 'any direct physical disturbance of a right, either public or private, which an owner enjoys in connection with his property; a right which gives the property an additional value; a right which is disturbed in a way that inflicts a special damage with respect to the property in excess of that sustained by the public generally'." *Hampton v. Metro. Water Reclamations Dist. Of Greater Chicago*, 2016 IL 119861, ¶ 27, 57 N.E.3d 1229, 1240. (citing *Citizens Utilities Co. of Illinois v. Metropolitan Sanitary District of Greater Chicago*, 25 Ill.App.3d 252, 256, 322 N.E.2d 857 (1974) (discussing the definition of "damaged" established in *Rigney v. City of Chicago*, 102 Ill. 64 (1881)). "Whether claimed by the owner as a plaintiff in an action at law or as a defendant in an eminent domain proceeding, 'the right to damages is the same and is based on the [takings clause]'." *Id.* (citing *Illinois Power & Light Corp. v. Peterson*, 322 Ill. 342, 347, 153 N.E. 577 (1926)).

systems that resulted in the damage caused to Plaintiffs' properties. There is no doubt this damage, Fuse Dep. 12:19-13:6, 18:22-19:3, 30:13-19, 34:12-35:16, 63:15-69:23, 140:04-155:22; Bennett Dep. 40:16-41:9, 46:23-47:5, 52:7-53:9, 56:2-57:23, 116:19-117:12, is a foreseeable consequence of Defendants' above referenced actions. *See, e.g.*, **Exhibit B**. And this damage will likely continue as there is no funding in place currently for a proposed trunk line to be constructed in North Centreville where the Plaintiffs reside, nor are Defendants required to complete their grant deliverables until May 2025. *See* **Exhibit C**, **Exhibit D**. Of the 59 list stations in need of repair, only 8 have been addressed. *See* **Exhibit E**. The record is replete with proof that Defendants have been aware of the flooding and sewage issues for years. *See* K. McCall Dep. 14:10-17, Traiteur Dep. 31:12-31:24; **Exhibit A**. Mayor Jackson testified he has been aware of the issues for decades. Jackson Dep. 83:8- 85:11.

Even if this Court declines to follow the legal framework for per se Takings enumerated in *Ideker Farms*, the Plaintiffs can still prove a taking occurred under the Supreme Court's temporary flooding analysis in *Arkansas Game and Fish Comm'n v. US*, 568 U.S. 523 (2012) as the damage to Plaintiff's properties was a foreseeable result of Defendants authorized government actions laid out above. Additionally, if this Court is to find in favor of Defendants under the Tort Immunity Act, by definition the plan that the City adopted is sufficient to qualify as government action, and the damage of Plaintiffs' homes was the foreseeable consequence of that so-called plan. This potential so-called plan rises to the level of a Taking under federal and state law.

WHEREFORE, Plaintiffs Earlie Fuse and Cornelius Bennett respectfully request that this Court deny Plaintiffs' Motion for Summary Judgment and for all other relief this Court deems fair and proper.

Respectfully submitted,

**EQUITY LEGAL SERVICES, INC.**

w/consent:    /s/Nicole D. Nelson
      Nicole D. Nelson
      Attorney for Plaintiffs
      P: 618.693.9800
      E: nnelson@equitylegalservices.org


**METROPOLITAN   ST.   LOUIS   EQUAL HOUSING & OPPORTUNITY COUNCIL**

      /s/Kalila J. Jackson
      Kalila J. Jackson, Pro hac vice
      Attorney for Plaintiffs
      Senior Staff Attorney
      P: 314-534-5800
      E: kjackson@ehoc-stl.org


w/consent:    /s/Kennedy Moehrs Gardner
      Kennedy Moehrs Gardner
      Attorney for Plaintiffs
      Senior Staff Attorney
      P: 314-534-5800
      E: kjackson@ehoc-stl.org

**NAACP**

w/consent:    /s/Martina Tiku
      Martina Tiku, Pro hac vice
      Attorney for Plaintiffs
      Assistant General Counsel
      P: 443-472-9473
      E: mtiku@naacpnet.org

## CERTIFICATE OF SERVICE

     I hereby certify that on this 23rd day of October, 2023, I electronically served this document to the following:

CROWDER & SCOGGINS, LTD.
Mark C. Scoggins
mscoggins@crowderscoggins.com

CLAYBORNE & WAGNER
Mike Wagner
mwagner@cswlawllp.com

TAFT STETTINIUS & HOLLISTER LLP
Erica Spitzig
ESpitzig@taftlaw.com

Philip Comella
PComella@taftlaw.com

/s/ Kalila J. Jackson

Kalila J. Jackson