IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CORNELIUS BENNETT, | ) | |
| EARLIE FUSE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 20-cv-530-DWD |
| | ) | |
| CITY OF CENTREVILLE, | ) | |
| TOWNSHIP OF CENTREVILLE, | ) | |
| COMMONFIELDS OF CAHOKIA, | ) | |
| MARIUS "MARK" JACKSON, | ) | |
| CURTIS MCCALL, | ) | |
| LAMAR GENTRY, | ) | |
| DENNIS TRAITEUR, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**DUGAN, District Judge:**

This matter comes before the Court on several motions:

**Doc. 127**: Defendants' Joint Motion to Dismiss Based on Primary Jurisdiction;

**Doc. 138**: Defendant City of Centreville's Joint Motion to Bar the Supplemental Report of Plaintiffs' Expert Jose A. Constantine;

**Doc. 141**: Defendants' Joint Motion for Summary Judgment;

**Doc. 146**: Plaintiffs' Motion to Strike Defendant's Reply at Doc. 144;

**Doc. 150**: Plaintiffs' Motion to Bar Defendants' Untimely Documents and for Sanctions; and

**Doc. 159**: the Parties' Joint Motion to Continue Trial Date and for Status Conference.

The Court has reviewed all relevant memorandum, responses, and replies (Docs. 134; 136; 139; 142; 143; 144; 147; 148; 151; 152; 153). The Court also heard arguments on

1

Defendants' Joint Motion to Dismiss Based on Primary Jurisdiction (Doc. 137), in connection with a similar motion in the related case *Centreville Citizens for Change et al. v. City of Cahokia Heights et al.*, SDIL Case No. 21-842-DWD.   After considering the arguments and briefing of the Parties, the Court issues the following rulings.

## Background

Plaintiffs Cornelius Bennett and Earlie Fuse bring this action against Defendants City of Centreville, Township of Centreville, Commonfields of Cahokia, Marius "Mark" Jackson, Curtis McCall, LaMar Gentry, and Dennis Traiteur (collectively referred to herein as "Defendants") related to Defendants' alleged indifference to the subpar stormwater and sewage disposal systems causing frequent stormwater and raw sewage to invade Plaintiffs' homes and yards in the City or Township of Centreville, Illinois, now known as Cahokia Heights, Illinois.  Plaintiffs' Amended Complaint (Doc. 60) asserts six claims:

**Count I:** 42 U.S.C. § 1983 Claim for violations of the Fifth Amendment's Taking Clause of the United States Constitution

**Count II:** Violation of Eminent Domain Clause of the Illinois Constitution

**Count III**: Negligent Trespass related to Sanitary Sewer Back Ups

**Count IV**: Negligent Trespass related to Stormwater Flooding (against Centreville and Township of Centreville)

**Count V:** Negligence related to Stormwater Flooding (against Centreville and Township of Centreville)

**Count VI:** Negligence related to Sewer Back Ups

(Doc. 60).  Counts I, II, III, and VI are asserted against all Defendants.  Counts IV and V are brought against only Defendants City of Centreville and the Township of Centreville. Plaintiffs seek monetary damages and injunctive relief.

### Doc. 127: Defendants' Joint Motion to Dismiss Based on Primary Jurisdiction

Defendants ask the Court to dismiss or stay this matter pending resolution of the United States Environmental Protection Agency's administrative proceedings with Cahokia Heights based on the "doctrine of primary jurisdiction."  *See Stoll v. Kraft Foods Glob., Inc.*, No. 1:09-CV-0364-TWP-DML, 2010 WL 3702359, at *1 (S.D. Ind. Sept. 6, 2010) (the "doctrine of primary jurisdiction allows a federal court to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight.'") (citing *Leib v. Rex Energy Operating Corp.*, No. 06-CV-802-JPG-CJP, 2008 WL 5377792, at *14 (S.D. Ill. Dec. 19, 2008) (quoting *In re StarNet, Inc.*, 355 F.3d 634, 639 (7th Cir. 2004)).   "When a court chooses to exercise primary jurisdiction, it does not dismiss the litigation but stays it pending the results of the agency's resolution of the issue, and the action resumes after the agency's decision if that decision has not resolved the entire controversy." *Leib*, 2008 WL 5377792, at *14 (citing *Baker v. IBP, Inc.*, 357 F.3d 685, 688 (7th Cir. 2004); *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 299 F.3d 643, 651 (7th Cir. 2002)).

The Seventh Circuit has used this doctrine to refer questions of statutory interpretation to relevant agencies.  For example, the Seventh Circuit referred the interpretation of the word "location" as found in the telephone "number portability"

3

provision of the Federal Communications Commission Telecommunications Act of 1996, 47 U.S.C. § 153(37) to the Federal Communications Commission ("FCC").  *See In re StarNet, Inc.*, 355 F.3d at 639.  In making this referral, the Seventh Circuit emphasized that the FCC did not have exclusive jurisdiction over the interpretation, but that its input was the "logical place for the judiciary to start."  *Id.* ("Only the FCC can disambiguate the word 'location'; all we could do would be to make an educated guess. And although the FCC's position would be subject to review by the judiciary for reasonableness, the agency's views are the logical place to start.").

The Circuit has also declined to invoke the doctrine when it would "facilitate an end run around" citizen suits authorized by statute, such as when the administrative proceedings were informal or would not address the relief raised in the citizen suit.  *See PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 619 (7th Cir. 1998) (finding the doctrines of primary jurisdiction doctrine or abstention inappropriate to bar a citizen suit brought under the Resource Conservation and Recovery Act ("RCRA") because there were no formal administrative proceedings in progress that the suit would disrupt and those administrative proceedings would not address the concerns raised in the citizens' suit); *Ryan v. Chemlawn Corp.*, 935 F.2d 129, 132 (7th Cir. 1991) (declining to apply the doctrine of primary jurisdiction when both parties agreed that the EPA could not provide the plaintiff with any form of compensatory or punitive damages, and speculating what role the EPA could even play in the suit).

In considering whether the relevant administrative proceedings are "formal" or "informal", it is important to note that the doctrine of primary jurisdiction differs from

statutory bars to citizen suits based on the "diligent prosecution" of an action by federal or state agencies.  *See, e.g.*, 33 U.S.C. § 1365(b)(1)(B) (citizen suits under the Clean Water Act are barred "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order[.]").  Instead, the Seventh Circuit has explained, that even if a citizen suit is not statutorily barred by a formal administrative proceeding, appropriate circumstances may still exist to apply the doctrine of primary jurisdiction.  *See PMC, Inc.*, 151 F.3d at 619 (explaining that although the citizens' suit under RCRA was not statutorily barred, "there may be room for applying the doctrines of abstention or primary jurisdiction (different labels for the same thing, in this context) in cases in which a state has a formal administrative proceeding in progress that the citizens' suit would disrupt [.]").

According to Defendants, a stay of the current proceedings is appropriate because the United States Environmental Protection Agency, and the Illinois Environmental Protection Agency (collectively referred to herein as the "Agencies") have been working with Cahokia Heights to address the sanitary sewer overflows at issue in Plaintiffs' complaint for years, and Defendants believe some, if not all, of the injunctive relief in Plaintiffs' complaint may be resolved by those ongoing efforts.  Specifically, on August 16, 2021, Cahokia Heights entered into an Administrative Order on Consent ("AOC") with the United States EPA (Doc. 127-2, at Exhibit 7, pp. 143-157).  Under the AOC, Cahokia Heights agreed to undertake several projects to address the Agencies' concerns

regarding the conditions of Cahokia Heights' sewer system and lift stations, including

requiring Cahokia Heights to:

1. Execute a series of interim operations and maintenance actions, including staff training, preparing a lift station status report, and submitting a lift station inspection and maintenance plan;
2. Develop and implement a Capacity, Management, Operations and Maintenance Program;
3. Prepare and implement investigation plans to identify and better understand both wet weather and dry-weather sanitary sewer overflows; and
4. Prepare and implement a corrective action plan to eliminate all known dry-weather sanitary sewer overflows.

(Doc. 127-2, pp. 149-152).  According to Defendants, Cahokia Heights has been timely

implementing the requirements of the AOC, and the now approved Capacity,

Management, Operations, and Maintenance Program.

In addition to the AOC, Cahokia Heights is implementing system repairs with

grant funding from the Illinois EPA, which requires Cahokia Heights to complete certain

construction activities by June 30, 2025 (Doc. 127-2, at Ex. 8, pp. 158-223).  The Illinois EPA

also approved Cahokia Heights' Construction Activities Strategies ("CAS") for the

project (Doc. 127-2, at Exhibits 9-11, pp. 224-299), and Defendants represent that design

and construction is underway.  Finally, Defendants maintain that they are in the process

of negotiating a civil Consent Decree to govern the final stages of the system repair that

would reflect the Agencies' judgment of what additional measures are necessary to

complete the corrective action and prevent future sanitary sewer overflows and potential

violations of the Clean Water Act (Doc. 127-1, at ¶ 15).

Defendants argue that dismissal or a stay of these proceedings would be appropriate while the Agencies are overseeing the repairs in the Administrative Order on Consent and negotiating the civil Consent Decree with Cahokia Heights. Defendants request dismissal, but also offer August 30, 2025 as a potential stay date. This date allegedly represents the end date for the current repair work funded by the Illinois EPA grant.

Plaintiffs oppose the Motion for at least three reasons (Doc. 134). First, Plaintiffs object to the timing of Defendants' Motion, arguing that it was filed more than two years after Defendants answered the amended complaint. Second, Plaintiffs argue that the doctrine of primary jurisdiction does not apply to this case because the case only involves individual claims. Finally, Plaintiffs submit, that even if the doctrine does apply, the stay factors sharply favor denying the stay because the Administrative Order on Consent does not conflict with Plaintiffs' claims, which are properly before the Court, and because applying the doctrine would disserve judicial economy. Alternatively, Plaintiffs ask that the Court consider bifurcating Plaintiffs' injunctive claims so Plaintiffs can continue with their monetary damages claims and stormwater claims which are not covered by the current administrative plans.

The Court is not persuaded that Defendants' Motion is untimely or that it is unable to exercise its authority to refer portions of this proceeding to the administrative Agencies working with Cahokia Heights to alleviate or repair some, if not all, of the structural

repairs at issue in Plaintiffs' Complaint and plaguing the larger community area.[1] Indeed, one of the principles underlying the doctrine of primary jurisdiction is the Court's ability to invoke the doctrine based on an individualized evaluation of each case.  *See Bradford Sch. Bus Transit, Inc. v. Chicago Transit Auth.*, 537 F.2d 943, 949 (7th Cir. 1976) ("There is no fixed formula for the invocation of the doctrine of primary jurisdiction and the decision whether to apply it depends upon a case by case determination of whether, in view of the purposes of the statute involved and the relevance of administrative expertise to the issue at hand, a court ought to defer initially to the administrative agency."); *see also In re StarNet, Inc.*, 355 F.3d at 639 (referring matter to the FCC while on appeal).

And the Court sees vast wisdom in permitting the United States Environmental Protection Agency and Illinois Environmental Protection Agency to provide guidance and manage the highly technical and expensive repairs needed to the water and sewer infrastructure.  *In re StarNet, Inc.*, 355 F.3d at 639 (the "doctrine of primary jurisdiction allows a federal court to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight.'").  Thus, the relevant issue here is not whether the Court can cede some of its jurisdiction here to the

---

[1]Based on the current record, there does not appear to be a material dispute of fact that Plaintiffs have faced devastating living conditions caused by the underserviced and deteriorating water and sewer systems in the community.  This finding in no way constitutes a finding of liability or causation, but, reviewing the evidence in the record most favorable to Plaintiffs – the non-moving parties here – there is no genuine debate that their lives and property have been impacted by the consistent sanitary sewer overflows from the past decades.

administrative agencies, but whether it should.  Of course, this does not mean the timing of Defendants' request is without concern.  Indeed, Plaintiffs' complaints regarding the Agencies' ability to effectively – and timely – complete the repairs they have been requesting for decades is highly significant here.

The Seventh Circuit has adopted a "case by case" approach in determining when the doctrine of primary jurisdiction should apply.  *Ryan*, 935 F.2d at 131 (citing *Bradford School Bus Transit, Inc.*, 537 F.2d at 949) ("There is no fixed formula for the invocation of the doctrine of primary jurisdiction and 'the decision whether to apply it depends upon a case by case determination … .'").  In making this determination, the Court considers the strong policy reasons that exist for applying the primary jurisdiction doctrine, namely, that the doctrine: (1) promotes consistency and uniformity, particularly where the development of the law is dependent upon administrative policy; (2) administrative agencies are uniquely qualified to handle certain complex areas outside of the conventional expertise of courts; and (3) it serves judicial economy because, if a dispute is fully resolved by an agency, the court need not intervene.  *Ryan*, 935 F.2d at 131; *see also Stoll*, 2010 WL 3702359, at *5

Although the Seventh Circuit has not articulated an exclusive list of factors for applying the doctrine of primary jurisdiction, some district courts have found it appropriate to weigh numerous factors, including:

> (1) whether the Court is being called on to decide factual issues not within the conventional experience of judges; question at issue is one within the conventional experience of judges; (2) whether the Defendants could be subjected to conflicting orders of both the Court and the administrative agency; (3) whether relevant agency proceedings have actually been

initiated; (4) whether the agency has demonstrated diligence in resolving the issue or has instead allowed the issue to anguish; and (5) whether the Court can fashion the type of relief requested by the plaintiff.

*Stoll*, 2010 WL 3702359, at *5 (collecting cases).

Here, the Court **FINDS** that the strong policy reasons behind the primary jurisdiction doctrine would be served in this case by a limited referral to the environmental Agencies. There is no dispute that the environmental Agencies are aware and involved with the extensive issues plaguing Plaintiffs' communities. Nor is there a dispute over the Agencies' unique qualifications for handling the complex issues here, or their ability to fashion and oversee appropriate remedies to the physical infrastructure required to address the injunctive relief issues in Plaintiffs' Complaint. Judicial economy would further be served by enlisting the Agencies' oversight here, as they are uniquely equipped to effect and enforce remediation efforts over these repairs. Further, should the Agencies be successful in compelling the remediation of the issues raised in the injunctive portion of Plaintiff's Complaint, the Court will alleviate any risk of subjecting the parties to conflicting orders from the Court and the administrative Agencies, or worse, from subjecting the parties to a Court Order that does not fully address the practical, and potentially changing, needs of the infrastructure repairs. Accordingly, the Court will **GRANT** Defendants' Motion to Stay, in part, and **REFER** this matter to the environmental Agencies for assistance in evaluating and resolving the injunctive relief portion of Plaintiffs' Complaint.

Nevertheless, despite these findings, the Court is gravely concerned with issues of diligence here. This case has been pending for years, and that Plaintiffs have invested

time and resources in litigating this case and bringing their grievances to the attention of the Court and the administrative Agencies.  Thus, the Court is very concerned with Plaintiffs' claims being set to languish without concrete and diligent actions from the Agencies.  Indeed, while the record before the Court does not give the Court a reason to question Defendants' intentions in working with the environmental Agencies to consummate a consent decree or make necessary repairs, the Court is equally cognizant that Plaintiffs and the Court have heard reports of these negotiations for years, without having direct access to the process, direction, or progress of the repairs.  Although these concerns do not outweigh the Court's prior findings that a limited referral of this case is necessary and prudent, the Court will require regular status reports from Defendants and the environmental Agencies on the progress of the referral, and the status of the alleged forthcoming consent decree.

These status reports shall be filed no less frequently than every 90 days in the public record and be made available to Plaintiffs and their counsel. The Court wishes to impress upon the Defendants that the information contained in these status reports must be thorough and specific to, and not mere summaries of, the work done, the progress made, the plans implemented, and anticipated timelines for each step of progress forecasted. This is because, upon the filing of each status report, the Court will re-evaluate the progress and diligence of the ongoing repairs, and if it becomes apparent to the Court that the referral no longer serves the interest of justice, judicial economy, or is prejudicial to any of the parties, the Court will revise the referral or consider bifurcating these proceedings.  However, at this juncture, the wisdom of permitting the environmental

agencies to evaluate and fashion a practical and effective remedy here should first be explored.

For these reasons, the Court **GRANTS, in part**, Defendants' Motion to Stay (Doc. 127), and **REFERS** the following issues to the consideration of the United States Environmental Protection Agency and the Illinois Environmental Protection Agency:

1. The scope and nature of the repairs that would be necessary to address the requested injunctive relief in Plaintiffs Earlie Fuse and Cornelius Bennett's Complaint at Doc. 60, including how to ensure: (1) stormwater and wastewater are not deposited or diverted onto Plaintiffs' properties; (2) all pump and lift stations are working at adequate capacity; (3) the necessity and locations required for the installation of new pump or lift stations and/or sewer lines; and (4) any other recommended repairs to the infrastructure issues identified in Plaintiffs' Complaint;

2. The progress of Cahokia Heights' compliance with its obligations under the above-identified Administrative Order on Consent; Capacity, Management, Operations and Maintenance Program; Constructive Activities Strategies; and any other like orders, agreements, or obligations with the United States Environmental Protection Agency and the Illinois Environmental Protection Agency related to the issues identified in Plaintiffs' Complaint;

3. The specifics of whether, when, and to what extent the existing Administrative Order on Consent; Capacity, Management, Operations and Maintenance Program; Constructive Activities Strategies; and any other like

12

orders, agreements, or obligations with the with the United States Environmental Protection Agency and the Illinois Environmental Protection Agency will address the requested injunctive relief in Plaintiffs' Complaint at Doc. 60; and

4.     The progress and anticipated completion date of Cahokia Heights' negotiations with the United States Environmental Protection Agency and the Illinois Environmental Protection Agency to enter into a civil Consent Decree, and the specifics of the corrective action contemplated in the forthcoming Consent Decree.

In accordance with this referral, these proceedings are **STAYED** in their entirety for 90-days, or until further order of the Court.  The current trial setting and final pretrial conference are therefore **VACATED**, and the parties' Joint Motion to Continue Trial Date and for Status Conference (Doc.159) is **DENIED as moot**.  By **February 1, 2024**, Defendants are **DIRECTED** to file a status report with the Court, detailing the progress made by the Agencies in addressing the Court's referred issues above.

Defendants are **DIRECTED** to send a copy of this Order to their contacts and representatives at the United States Environmental Protection Agency and the Illinois Environmental Protection Agency, and to provide public access to this Order.

The parties are further granted leave to petition the Court to modify the current stay and referral should appropriate circumstances exist to do so.

### Doc. 141: Defendant's Joint Motion for Summary Judgment

Defendants seek summary judgment on Plaintiffs' claims, arguing that they are entitled to immunity under the Illinois Tort Immunity Act (Doc. 142).  Defendants

maintain that the underfunding and infrastructure failures were discretionary budgeting decisions made by Defendants after balancing the needs of other municipal interests, thus resulting in policy determinations that are entitled to immunity.  Defendants also seek summary judgment on Plaintiffs' takings claims, arguing that Plaintiffs cannot establish that the alleged harm to their properties arose from governmental action.  Plaintiffs oppose the Motion (Doc. 147).

Summary judgment is proper if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to, and draw all reasonable inferences in favor of, the non-moving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

The Illinois Tort Immunity Act, 745 Ill. Comp. Stat. Ann. 10/2-109, governs whether and under what circumstances local governmental entities are immune from liability in civil actions.  *Andrews v. Metro. Water Reclamation Dist. of Greater Chicago*, 2019 IL 124283, at ¶ 23.  Sections 2-109 and 2-201 of the Tort Immunity Act provide:

> A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable. 745 Ill. Comp. Stat. Ann. 10/2-109.

> Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 Ill. Comp. Stat. Ann. 10/2-201 (2012).

"Read together, these sections shield a municipality from liability for the discretionary acts or omissions of its employees." *Andrews*, 2019 IL 124283, at ¶ 23 (citing *Smith v. Waukegan Park Dist.*, 231 Ill. 2d 111, 118 (2008)).

Because the Tort Immunity Act "is in derogation of the common law, it must be construed strictly against the public entity seeking immunity", and the public entity or employee asserting the defense "bears the burden of proving it is entitled to that immunity." *Andrews*, 2019 IL 124283 (citing *Snyder v. Curran Twp.*, 167 Ill. 2d 466, 477 (1995), *Van Meter v. Darien Park Dist.*, 207 Ill. 2d 359, 370 (2003)).   The Illinois Supreme Court has outlined a twofold test for determining whether a municipality is entitled to discretionary immunity:

> The municipal defendant must establish that (1) the employee held either a position involving the determination of policy *or* a position involving the exercise of discretion and (2) the employee engaged in *both* the determination of policy *and* the exercise of discretion when performing the act or omission from which the plaintiff's injury resulted.

*Andrews v. Metro. Water Reclamation Dist. of Greater Chicago*, 2019 IL 124283, at ¶ 27 (emphasis in original).   "Policy determinations" are "decisions requiring the public entity or employee to balance competing interests and make a judgment call as to what solutions will best serve each of those interests." *Andrews*, 2019 IL 124283 (citing *Harrison v. Hardin Cnty. Cmty. Unit Sch. Dist. No. 1*, 197 Ill. 2d 466, 472 (2001)).   These interests may

include safety, convenience, and cost. *Andrews*, 2019 IL 124283 (citing *West v. Kirkham*, 147 Ill. 2d 1, 11 (1992)).

"Exercises of discretion are those that are 'unique to a particular public office.'" *Andrews*, 2019 IL 124283 (citing *Snyder*, 167 Ill. 2d at 474). "An employee's act or omission will be deemed discretionary where the employee has exercised 'personal deliberation and judgment in deciding whether to perform a particular act, or how and in what manner that act should be performed.'" *Andrews*, 2019 IL 124283 (quoting *Monson v. City of Danville*, 2018 IL 122486, ¶ 30). "Determining whether an act or omission is discretionary should be made on a case-by-case basis depending on the particular facts and circumstances." *Andrews*, 2019 IL 124283 (citing *Snyder*, 167 Ill. 2d at 474). Further, to invoke immunity under section 2-201, the municipality must present evidence that it made a "conscious decision" with respect to the acts or omissions alleged in the complaint, and the failure to do so is "fatal." *Id.* at ¶ 31.

Here, Defendants argue that all individual Defendants faced the challenge of balancing competing interests with a limited budget, thus requiring them to make policy decisions and exercise discretion entitled to immunity under the Tort Immunity Act. As examples, Defendants point to testimony from Defendants McCall, Traiteur, Jackson, and Gentry, which show generally that Defendants knew of the ongoing infrastructure issues and desire to find funding sources for those repairs, but that the City's budget could not support those repairs such that Defendants prioritized other projects (Docs. 142-1, 142-2, 142-3, 142-4).

16

Plaintiffs object to Defendants' immunity argument because Defendants failed to raise the defense in any of its Answers filed in this matter (Doc. 147). Indeed, Defendants did not include this defense in its answers (Docs. 62, 64, 65). However, in the context of the Tort Immunity Act, "an affirmative defense is not waived, despite the fact that it was not raised in an answer to a complaint, if the defense is subsequently raised without objection in a motion for summary judgment." *See Donath v. Vill. of Plainfield*, 2020 IL App (3d) 190762, ¶18; *see also Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005) (excusing waiver of affirmative because plaintiff "was not prejudiced; he was aware of the exhaustion issue even when he filed his complaint, and he confronted the defense in responding to the motion for summary judgment"). Plaintiffs argue that they were prejudiced by Defendants raising their affirmative defense during their motion for summary judgment. The Court is inclined to agree that Defendants were not dilatory in raising their immunity defense. However, because the Court finds that material issues of fact are in dispute over this issue such that Defendants are not entitled to summary judgment, the Court finds that Plaintiffs were not prejudiced by the late raising of this defense. Further, due to the Court's imposition of the limited stay detailed above, should Plaintiffs determine they need additional relief related to this defense so to avoid prejudice at trial, Plaintiffs may present an appropriate motion to the Court for consideration.

Turning to the merits of Defendants' immunity defense, the Court finds that material issues of fact are in dispute over this issue, such that Defendants are not entitled to summary judgment. Some of the evidence in the record supports Defendants' view

that they made conscious decisions to not allocate funding or complete repairs for the issues in Plaintiffs' Complaint.  However, much of the active decision-making, to the extent it can be considered conscious decision-making, appears to have occurred after the Illinois EPA and United States EPA's involvement in the case, in or about 2019-2021.  Prior to that time, evidence in the record supports Plaintiffs' view that Defendants were not making affirmative decisions concerning these issues and were not otherwise deliberating on how to prioritize the ongoing infrastructure issues in light of the city's budgeting concerns.

For example, Centerville's former Mayor and Street Administrator both testified that they did not know Centreville had any obligations to maintain certain stormwater ditches, lift stations, or the sanitary sewer system until about 2019 (Doc. 147-14; Doc. 147-16).  Specifically, Defendant Jackson, who served as Mayor of Centreville from 2007 to 2021, testified to not knowing that the city had any obligation to maintain certain stormwater ditches, in part, because his administration never reviewed agreements that the city entered into before their tenure:

> Q. When you became the mayor, what was the -- what was the process of you taking over from your predecessor?
>
> **[Mr. Jackson] Pretty much we went in, and we were -- we discussed things that had been going on. But we didn't, like, open up file cabinets and look at file cabinets and what was supposed to be done by the new administration**.
>
> Q. And at no point did you ever -- well, let me ask you this. Let me say that. That was coming out wrong. At any point after becoming mayor, did you go through the filing cabinet and review agreements that the City may have entered into before your tenure?

18

> **[Mr. Jackson]. No, ma'am.**
>
> Q. At no point in your -- in the entire 16 years that you were mayor?
>
> **[Mr. Jackson]. Only when -- no, I didn't.**

(Doc. 147-14, pp. 15-16; *see also* Doc. 147-14, pp. 3-4). Similarly, Defendant Allen, Centerville's former Street Administrator, testified that he did not know his job included maintaining lift stations or the sanitary sewer system until 2019 "when someone from the EPA" told him (Doc. 147-16, pp. 3, 8).

Further, as for the specific decision-making procedures for reviewing budget proposals or for prioritizing the allocation of funds to specific projects, Centerville's former Treasurer, Ms. Millard, testified that there was no city budget prepared during her eight-year tenure, from approximately 2014-2021, because "there wasn't money to do nothing." (Doc. 147-20, p. 6).   Centreville's former General Manager, Dennis Traiteur, also testified that from 2003 to 2001, he never approached the board to request funding for the ongoing inflow and infiltration issues because he believed the board would not want to raise rates to afford the cost of repairs (Doc. 147-17, pp. 11-13).   However, Mr. Traiteur also confirmed that Defendants never asked for or prepared estimates for those repairs, and otherwise did not have a priority list for allocating funding to certain repairs:

> Q. Okay. So then how did you know what the cost was going to be? And I'm going to back up. What was the approximate cost to resolve the inflow and infiltration issues in the system?
>
> **A. I do not know.**
>
> Q. Okay. So then how did you know that it would be too costly and that the board would not approve it because it would raise rates?

**A. Through discussions with the board, we knew that it would be very costly to make improvements to the sewer lines in that area because of the age of the sewer lines.**

Q. Okay. But nobody had any documents prepared that they were consulting with that gave them the actual costs?

**A. No. There was no engineer estimates produced.**

Q. Okay. And outside of engineers, you didn't collect any information, or the board didn't collect any information that gave them a cost of what it would take to resolve the inflow and infiltration?

**A. No.**

Q. Okay. And why?

**A. Why did we not prepare?**

Q. Why didn't you -- why didn't you -- yeah. Why didn't you figure out how much it was going to -- why didn't you obtain a price quote for how much it would cost to resolve these issues in the system?

**A. We -- we had so many other issues to deal with in our district that we just did not address it.**

Q. Okay. What were the other areas that you had to deal with?

**A. We had water main relocations. We had other lift stations that needed to be replaced. Various different projects going on constantly in our system.**

Q. Okay. And so then was there a prioritization system that you all were using to determine which lift stations and which locations would be prioritized as far as funding for resolution of issues?

**A. Did we prepare an actual priority list? No.**

(Doc. 147-17, pp. 11-13).

As for their actions to secure funding resources for the infrastructure repairs,

Defendant Jackson testified that he did not recall actively reaching out for funding

resources from any County, State, or agency until 2018 or 2019 (Doc. 142-1, pp. 233-36). Similarly, Defendant Gentry, Centreville's former City Administrator and TIF Director, who also oversaw the City's finances, testified that Centerville had not had an opportunity to apply for a federal grant since 2004 (Doc. 147-15, pp. 30-31).

While there is some evidence in the record that Defendants were engaging in some decision making concerning the ongoing infrastructure issues and allocation of the City's limited financial resources, other parts of the record show that Defendants were unaware of the City's obligations to maintain the stormwater ditches, lift stations, and sewer systems, or to prepare annual budgets. Thus, a reasonable jury could infer that Defendants did not make any decision, let alone a conscious decision, about these issues because they did not know they held an obligation to make them in the first place. Moreover, it is not outwardly apparent from the record that Defendants engaged in any deliberate procedure or decision-making process concerning the allocation (or non-allocation) of funds to the underlying sewer systems. *See Andrews*, 2019 IL 124283 ("Policy determinations" are "decisions requiring the public entity or employee to balance competing interests and make a judgment call as to what solutions will best serve each of those interests).

The Illinois Supreme Court instructs that immunity under the Tort Immunity Act is not available for nondecisions. *See Andrews*, 2019 IL 124283 ("In the absence of a judgment call and a weighing of risks and benefits, there is nothing to protect. . . . [I]mmunizing a nondecision would reward public officials and employees who ignore problems instead of addressing them. It also would broaden the scope of discretionary

immunity well beyond what the legislature intended."). Thus, to be entitled to immunity, the statute requires "that the act or omission giving rise to the injuries must constitute both an exercise of discretion and a determination of policy." *Id.* at ¶ 37. "This language requires that the entity or person claiming immunity must have made an actual decision to take no action given the circumstances." *Id.* Here, there are material questions of fact as to whether Defendants made any affirmative decisions to not proceed with infrastructure repairs, and instead allocate funding to other projects, or whether Defendants even sought to determine an estimate of the costs that would be needed to make those repairs. Given the conflicting evidence in the record, genuine issues of fact exist as to whether Defendants' actions could be characterized as discretionary versus ministerial. Because it is inappropriate to resolve these issues or weigh evidence at this stage, *see Washington v. Haupert*, 481 F.3d 543, 551 (7th Cir. 2007), summary judgment is not appropriate.

Summary judgment is also not appropriate on Plaintiffs' takings claims. A property owner possesses an "actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2167 (2019). Regularly recurring government-induced flooding of a property can also constitute to a compensable "taking" for purposes of the Fifth Amendment. *See Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 32 (2012) ("[W]here real estate is actually invaded by superinduced additions of water, earth, sand, or other material ... so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution.") (citing *Pumpelly v. Green Bay &*

*Mississippi Canal Co.*, 80 U.S. 166 (1871)).  To establish a taking, Plaintiffs must show that the government directly and proximately caused the flooding.  *See Ministerio Roca Solida, Inc. v. United States, 156 Fed. Cl. 346, 365 (2021)*.

Defendants maintain that they took no affirmative government actions which directly and proximately caused the alleged damaged to Plaintiffs' property (Doc. 142). Instead, Defendants proffer that the chronic flooding is caused by a lack of governmental action and/or other stormwater conditions in the area, and any alleged inaction on their parts in not funding or maintaining the sewer infrastructure cannot constitute intentional affirmative action to support Plaintiffs' takings claims (Doc. 142) (citing *St. Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1360–62 (Fed. Cir. 2018) (takings claims must be based "on affirmative government acts," and the government cannot be liable for a mere "failure to act.")).  However, here there are material issues of fact in dispute as to whether the damage to Plaintiffs' properties resulted from affirmative government actions authorized by Defendants.

There is evidence in the record that suggests Defendants authorized some repairs to lift stations on an "as needed basis" in response to communications received or violation notices issued from the environmental Agencies, opposed to a systemic approach.  (Doc. 142-1, p. 32) (Marius Jackson compared his approach to fixing the ongoing sewerage issues as a "Band-Aid" that would never repair the actual problem); (Doc. 147-12) (Correspondence from the Illinois EPA indicating that additional sewer overflow complaints were received, and encouraging Defendants to conduct periodic investigations to better plan for sewer repairs and replacements); (Doc. 147-16, pp. 21-22)

(Corey Allen testified that the procedure for investigating residential complaints involved him physically inspecting an address after being provided with the information from City Hall, but that there was no real system in place for him to communicate that he had addressed the concern unless he needed to hire an outside contractor or vendor); (Doc. 147-17, p. 13) (Dennis Traiteur testified that the City had no priority list for determining which lift stations and locations would be prioritized for repair or replacement).

Plaintiffs further testified that these fragment repairs sometimes resulted in unfinished work and contributed to the worsening conditions on their properties. (Doc. 147-13, ¶¶ 7-10) (Plaintiff Bennett stated that some work performed by the City to the ditches in his front yard was left unfinished, resulting in a large tree blocking the ditch, which obstructed the ability for water to flow and contributed to the worsening conditions on his property). Accordingly, whether these fragmented actions caused or contributed to the ongoing sewage overflows on Plaintiffs' properties is a material dispute of fact that is inappropriate for resolution at summary judgment. *See Washington, 481 F.3d at 551* (the Court does not make credibility determinations or weigh the evidence at summary judgment). For these reasons, Defendants' Motion for Summary Judgment (Doc. 141) is **DENIED**.

## Remaining Motions

Finally, based on the above findings, the Court **DENIES, without prejudice**, Defendant Centerville's Motion to Bar the Supplemental Report of Plaintiff's Expert Jose A. Constantine (Doc. 138) and Plaintiffs' Motion to Bar Defendants' Untimely Documents

and for Sanctions (Doc. 150).  To the extent the issues raised in these motions are relevant to the admissibility of documents and testimony at trial, the parties are granted leave to refile the motions upon the lifting of the above stay of proceedings. Plaintiff's Motion to Strike the Reply at Doc. 144 (Doc. 150) is also **DENIED**.

       **SO ORDERED.**

       Dated:  January 5, 2024

_____
DAVID W. DUGAN
United States District Judge